1   ALDRICH LAW FIRM, LTD.
    JOHN P. ALDRICH (SBN #6877)
2   7866 West Sahara Avenue
    Las Vegas, NV 89117
3   Telephone: (702) 853-5490
    Facsimile: (702) 227-1975
4   E-mail: jaldrich@johnaldrichlawfirm.com

5   ROBBINS ARROYO LLP
    BRIAN J. ROBBINS
6   CRAIG W. SMITH
    ASHLEY R. RIFKIN
7   STEVEN R. WEDEKING
    5040 Shoreham Place
8   San Diego, CA 92122
    Telephone: (619) 525-3990
9   Facsimile: (619) 525-3991
    E-mail: brobbins@robbinsarroyo.com
10          csmith@robbinsarroyo.com
            arifkin@robbinsarroyo.com
11          swedeking@robbinsarroyo.com

12  Attorneys for Plaintiff

13                  UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
14

15  DUSTIN GAJ, Derivatively on Behalf of      )   Case No.
    WYNN RESORTS, LTD.,                         )
16                                              )   VERIFIED STOCKHOLDER DERIVATIVE
                        Plaintiff,              )   COMPLAINT FOR VIOLATION OF
17          v.                                  )   SECURITIES, LAW, BREACH OF
                                                )   FIDUCIARY DUTY, WASTE OF
18  STEPHEN A. WYNN, MATTHEW                    )   CORPORATE ASSETS, AND UNJUST
    MADDOX, KIMMARIE SINATRA, D.                )   ENRICHMENT
19  BOONE WAYSON, ALVIN V.                      )
    SHOEMAKER, JOHN J. HAGENBUCH,               )
20  ROBERT J. MILLER, RAY R. IRANI,             )
    PATRICIA MULROY, CLARK T.                   )
21  RANDT, JR., JAY L. JOHNSON, MARC            )
    D. SCHORR, J. EDWARD VIRTUE,                )
22  STEPHEN COOTEY, and CRAIG S.                )
    BILLINGS,                                   )
23                                              )
                        Defendants,             )
24                                              )
            -and-                               )
25                                              )
    WYNN RESORTS, LTD., a Delaware              )
26  Corporation,                                )
                                                )
27                      Nominal Defendant.      )   DEMAND FOR JURY TRIAL
                                                )
28

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Wynn Resorts, Ltd. ("Wynn" or the "Company") to hold certain of its directors and officers accountable for violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. This case arises from a systemic, decades-long pattern of sexual harassment and abuse by the Company's founder and former Chief Executive Officer ("CEO"), Stephen A. Wynn ("S. Wynn"). Wynn's Board of Directors (the "Board") and Company officers facilitated and knowingly ignored defendant S. Wynn's inappropriate conduct and the hostile work environment he created for female employees at Wynn. These wrongs resulted in billions of dollars in damages to Wynn's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2.      Wynn's troubles first came to light on January 26, 2018, when the *Wall Street Journal* ("*WSJ*") published a bombshell article detailing allegations of sexual harassment and abuse by defendant S. Wynn dating back to the 1970s. The *WSJ* article, based on interviews with more than 150 current and former Company employees, explained that for more than a decade defendant S. Wynn subjected female Wynn employees to unwanted sexual advances, harassment, and sexual assaults. Among other revelations was that defendant S. Wynn paid a $7.5 million settlement to a former manicurist at Wynn Las Vegas who accused him of sexually assaulting her in 2005.

3.      Defendant S. Wynn's long history of sexual harassment and assault continued to trickle out in the days and months following these alarming revelations. For example, on March 19, 2018, the *WSJ* reported that defendant S. Wynn had paid a settlement to a second Wynn employee in 2006 relating

to sexual misconduct allegations.   A number of complaints have also surfaced corroborating what former employees describe as an atmosphere of terror at the Company.

4.     While this news was a shock to the public, defendant S. Wynn's reported inappropriate conduct was known internally for some time by Wynn's fiduciaries, including members of the Board.  In 2009, Elaine Wynn, defendant S. Wynn's ex-wife and a Board member at the time, informed a Board representative of defendant S. Wynn's 2005 sexual assault of a Company employee and resulting $7.5 million settlement.   The Board was again alerted to defendant S. Wynn's improprieties in March 2016, when Elaine Wynn filed court documents in litigation against the Company and certain of its directors and officers, describing a "multimillion dollar payment" made by defendant S. Wynn following allegations that he engaged in "serious misconduct" "on company property against an employee."  The documents described a pattern of reckless behavior by defendant S. Wynn that "left the directors and the Company vulnerable to potential liability and regulatory exposure."  Rather than investigating the misconduct and remedying Wynn's toxic work environment, the Board concealed defendant S. Wynn's reported indiscretions and turned a blind eye to the Company's hostile culture.

5.     Furthermore, in 2016 and 2017, after the Board was aware of defendant S. Wynn's pattern of sexual harassment and assault, the Director Defendants (as defined herein) issued materially misleading Proxy Statements urging stockholders to vote to reelect certain directors, including defendant S. Wynn.  Providing information concerning defendant S. Wynn's improprieties, and the Board's failure to remedy the long-standing issues, would result in stockholders' rejection of the Board and its recommendations. Accordingly, in seeking stockholder votes, each of the Proxy Statements omitted material information concerning, among other things, defendant S. Wynn's inappropriate and illegal behavior and the Company's inadequate internal controls which facilitated the behavior detailed herein.

6.     When the public eventually learned of defendant S. Wynn's long history of sexual harassment and abuse, Wynn's stock plummeted 18.5%, or $37.12 per share, from $200.60 per share on January 25, 2018, to close at $163.48 per share on January 29, 2018, erasing more than $3.8 billion in market capitalization in two trading days.

7.     Making matters worse, following these shocking revelations, the Massachusetts Gaming Commission and Nevada Gaming Control Board both opened investigations into the Company over the

sexual misconduct allegations reported in the *WSJ* article.  Fallout from these investigations could be severe.  The Nevada Gaming Control Board recently concluded its investigation, finding that Wynn executives repeatedly ignored sexual misconduct claims against defendant S. Wynn.  As a result of these findings, the Nevada Gaming Commission levied a record $20 million fine against the Company.  The alarming disclosures could also have serious implications for Wynn's $2.4 billion Wynn Boston Harbor casino project in Everett, Massachusetts, set to open in mid-2019.  Because the Company did not disclose defendant S. Wynn's improprieties during the application process for a fifteen-year gaming license, the Massachusetts Gaming Commission reopened its prior determination that Wynn met its suitability requirements and could levy heavy fines against the Company, place conditions on its license, or revoke it entirely.

8.     Before the Company could be rocked by these revelations, certain of the Individual Defendants (as defined herein) dumped over ***$56 million*** worth of their personally held stock.   In addition, during this time, certain of the Individual Defendants collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Wynn's actual performance while under their stewardship.

9.     As a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action pending in the U.S. District Court for the District of Nevada on behalf of investors who purchased Wynn shares at artificially inflated prices (the "Securities Class Action").  The Securities Class Action seeks claims against Wynn and defendants S. Wynn, Craig S. Billings ("Billings"), Stephen Cootey ("Cootey"), and Matthew Maddox ("Maddox") in connection with the Company's improper statements, including claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

10.     On August 28, 2018, on behalf of plaintiff, a Wynn stockholder, plaintiff's counsel sent a litigation demand (the "Demand") to the Board, demanding that the Board investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging Wynn, including certain of the Company's current and former officers and directors.  In response, counsel at Potter Anderson Corroon LLP ("Potter Anderson") stated they had been retained as counsel by an undisclosed "committee of the Board" that was purportedly investigating the Demand as

well as several other stockholder demands that were similar to plaintiff's.

11.     After not hearing from the Company for two months, on November 27, 2018, plaintiff's counsel sent a follow-up letter requesting an update on the status of the investigation and repeating his previous request for Potter Anderson to provide the identities of the Board members that were investigating the demands.  In response, Potter Anderson declined to identify the committee or provide the requested documents.  Instead, in a letter dated November 29, 2018, Potter Anderson stated that on the recommendation of a "Demand Review Committee," the Board would be deferring its final decision on the Demand pending receipt of the results of certain undisclosed "ongoing administrative inquiries."

12.     Five months after plaintiff first sent his Demand, the Board effectively rejected the Demand without even completing an investigation.  On January 7, 2019, in a cursory two-page letter, counsel for the still undisclosed "committee of the Board" notified plaintiff that the Board had made the decision to "suspend indefinitely" any further proceedings on the part of the committee related to the Demand.

13.     The Board had an affirmative duty under Nevada law to conduct a reasonable, objective, and good faith investigation into the allegations in the Demand, and to determine on the basis of that investigation whether the Demand's factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the Company's best interests.  This is true despite the pending derivative litigation related to the claims plaintiff demanded the Board investigate.  Unlike a demand, a derivative action leaves the wrongdoers in charge of the Company.  Accordingly, by rejecting the Demand before even conducting an investigation, the Board breached its fiduciary duties.

14.     In light of the Board's improper refusal to act, plaintiff brings this action to remedy the harm caused by defendants' wrongful actions.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.  Jurisdiction is also conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

16.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Wynn maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Wynn, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

18.     Plaintiff Dustin Gaj was a stockholder of Wynn at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Wynn stockholder. Plaintiff is a citizen of Missouri.

**Nominal Defendant**

19.     Nominal Defendant Wynn Resorts is a Nevada corporation with principal executive offices located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada.  Accordingly, Wynn is a citizen of Nevada.  Wynn Resorts is a developer, owner, and operator of destination casino resorts that integrate hotel accommodations and a wide range of amenities such as fine dining outlets, retail offerings, and entertainment theaters.   The Company operates two integrated resorts in the Macau Special Administrative Region of the People's Republic of China, Wynn Macau and Wynn Palace, as well as Wynn Las Vegas located in Las Vegas, Nevada.  Wynn Resorts is also currently constructing Wynn Boston Harbor in Everett, Massachusetts, and expects to open the resort in mid-2019.  As of December 31, 2017, Wynn had approximately 25,200 employees.

**Defendants**

20.     Defendant S. Wynn founded Wynn in June 2002 and was the Company's CEO, Chairman of the Board, and a director from June 2002 to February 2018.  Defendant S. Wynn was also CEO, Chairman of the Board, President, and a director of Wynn Macau, Limited from September 2009 to January 2014; and CEO, Chairman of the Board, and a director of Wynn Resorts (Macau), S.A. from October 2001 to at least March 2017.  Defendant S. Wynn is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant S. Wynn knowingly, recklessly, or with gross negligence: (i) engaged in a pattern of sexual misconduct against female Company employees; (ii) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (iii) made or allowed the Company to make improper statements in its press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; and (iv) violated the Company's Guidelines (as defined herein), Code of Conduct (as defined herein), and other duties required of Board members as set forth in the Articles of Incorporation (the "Articles") and other corporate governance documents.  The Company paid defendant S. Wynn the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|----------------------------------------|------------------------|-------|
| 2017 | $2,500,000 | $15,000,000 | $15,000,000 | $2,022,695 | $34,522,695 |
| 2016 | $2,500,000 | $12,500,000 | $12,500,000 | $656,985 | $28,156,985 |
| 2015 | $2,500,000 | $8,750,000 | $8,750,000 | $680,391 | $20,680,391 |
| 2014 | $4,000,000 | $10,000,000 | $10,000,000 | $1,322,854 | $25,322,854 |

Defendant S. Wynn is a citizen of Nevada.

21.     Defendant Maddox is Wynn's President and has been since November 2013, CEO and has been since February 2018, and a director and has been since August 2018.  Defendant Maddox was also Wynn's Chief Financial Officer ("CFO") from March 2008 to May 2014; Treasurer from May 2006 to November 2013 and also from May 2002 to March 2003; Senior Vice President of Business Development from January 2007 to March 2008; and Vice President of Investor Relations from May

2002 to March 2003.  Defendant Maddox was also a director of Wynn Macau, Limited from March 2013 to February 2018; Senior Vice President of Business Development for Wynn Las Vegas, LLC from September 2005 to December 2006; CFO of Wynn Resorts (Macau), S.A. from March 2003 to September 2005.  Defendant Maddox is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Maddox knowingly, recklessly, or with gross negligence: (i) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (ii) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (iii) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; (iv) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents; and (v) improperly rejected the Demand.  While in possession of material, nonpublic information concerning Wynn's true business health, defendant Maddox sold 223,157 shares of his personally held Wynn stock for $32,162,052.57 in proceeds.  Wynn paid defendant Maddox the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|----------------------------------------|------------------------|-------|
| 2017 | $1,500,000 | $21,030,000 | $1,800,000 | $486,633 | $24,816,633 |
| 2016 | $1,500,000 | $1,500,000 | $1,500,000 | $114,703 | $4,614,703 |
| 2015 | $1,500,000 | $1,200,000 | $1,200,000 | $178,932 | $4,078,932 |
| 2014 | $1,500,000 | $1,500,000 | $1,500,000 | $314,400 | $4,814,400 |

Defendant Maddox is a citizen of Nevada.

22.    Defendant Kimmarie Sinatra ("Sinatra") was Wynn's General Counsel from January 2004 to July 2018; Executive Vice President and Secretary from February 2006 to July 2018; Senior Vice President from January 2004 to February 2006; and was also an advisor to the Company from August 2018 to December 2018.  Defendant Sinatra was also a director of Wynn Macau, Limited from April 2017 to August 2018.  Defendant Sinatra knowingly, recklessly, or with gross negligence: (i) failed to

ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; and (iv) failed to inform Massachusetts gaming regulators of defendant S. Wynn's $7.5 million settlement over sexual harassment allegations when the Company applied for its Massachusetts gaming license. While in possession of material, nonpublic information concerning Wynn's true business health, defendant Sinatra sold 121,135 shares of her Wynn stock for $16,154,085.26 in proceeds.  Wynn paid defendant Sinatra the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $1,000,000 | $10,815,000 | $1,200,000 | $279,043 | $13,294,043 |
| 2016 | $873,654 | $850,000 | $850,000 | $65,086 | $2,638,740 |
| 2015 | $850,000 | $680,000 | $680,000 | $129,156 | $2,339,156 |
| 2014 | $840,769 | $2,474,875 | $850,000 | $160,310 | $4,325,954 |

Defendant Sinatra is a citizen of Nevada.

23.    Defendant D. Boone Wayson ("Wayson") was Wynn's Chairman of the Board from February 2018 to November 2018 and a director from August 2003 to November 2018.  Defendant Boone was the Chairman of the Board's Audit Committee from at least March 2013 to May 2015, and a member of that committee from at least March 2013 to at least April 2018, and was also a member of the Compensation Committee in at least March 2013.  Defendant Wayson knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain

his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; and (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents.  While in possession of material, nonpublic information concerning Wynn's true business health, defendant Wayson sold 37,500 shares of his Wynn stock for $3,267,000 in proceeds.  Wynn paid defendant Wayson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $120,000 | $249,955 | - | - | $369,955 |
| 2016 | $127,500 | $249,963 | - | $7,009 | $384,472 |
| 2015 | $129,250 | $249,884 | - | $2,927 | $382,061 |
| 2014 | $139,500 | - | $249,529 | - | $389,029 |

Defendant Wayson is a citizen of Maryland.

24.     Defendant Alvin V. Shoemaker ("Shoemaker") was a Wynn director from December 2002 to December 2018.  Defendant Shoemaker was a member of Wynn's Audit Committee and Compensation Committee from at least March 2013 to at least April 2018.  Defendant Shoemaker knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the

Company's operations and compliance policies; and (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents.  While in possession of material, nonpublic information concerning Wynn's true business health, defendant Shoemaker sold 25,000 shares of his Wynn stock for $3,866,100 in proceeds. Wynn paid defendant Shoemaker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $123,000 | $249,955 | - | - | $372,955 |
| 2016 | $127,500 | $249,963 | - | $7,010 | $384,473 |
| 2015 | $123,000 | $249,884 | - | $2,927 | $375,811 |
| 2014 | $123,000 | - | $249,529 | - | $372,529 |

Defendant Shoemaker is a citizen of Idaho.

25.     Defendant John J. Hagenbuch ("Hagenbuch") was a Wynn director from December 2012 to May 2018.  Defendant Hagenbuch was the Chairman of Wynn's Audit Committee from June 2015 to at least April 2018, and a member of that committee from at least March 2013 to at least April 2018, and was also a member of the Compensation Committee from at least March 2014 to at least April 2018. Defendant Hagenbuch knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; and (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents.  While in possession of material, nonpublic information concerning Wynn's true

business health, defendant Hagenbuch sold 1,150 his shares of his Wynn stock for $147,661.50 in proceeds.  Wynn paid defendant Hagenbuch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $139,500 | $249,955 | - | - | $389,455 |
| 2016 | $144,000 | $249,963 | - | $7,010 | $400,973 |
| 2015 | $131,750 | $249,884 | - | $2,927 | $384,561 |
| 2014 | $124,500 | - | $249,529 | - | $374,029 |

Defendant Hagenbuch is a citizen of Idaho.

26.     Defendant Robert J. Miller ("Miller") was a Wynn director from October 2002 to May 2018.   Defendant Miller was the Chairman of Wynn's Corporate Compliance Committee (the "Compliance Committee") and a member of that committee from at least March 2013 to at least April 2018, and was also a member of Wynn's Audit Committee from at least March 2013 to at least April 2018.  Defendant Miller knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; and (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents.  Wynn paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $252,000 | $249,955 | - | - | $501,955 |
| 2016 | $261,000 | $249,963 | - | $7,010 | $517,973 |
| 2015 | $255,000 | $249,884 | - | $2,927 | $507,811 |

| 2014 | $256,500 | - | $249,529 | - | $506,029 |

Defendant Miller is a citizen of Nevada.

27.     Defendant Ray R. Irani ("Irani") was a Wynn director from October 2007 to March 2018. Defendant Irani was the Chairman of Wynn's Compensation Committee in at least March 2013 and a member of that committee from at least March 2013 to at least March 2016.  Defendant Irani knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; and (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents. Wynn paid defendant Irani the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $91,500 | $249,955 | - | - | $341,455 |
| 2016 | $105,433 | $249,963 | - | - | $362,406 |
| 2015 | $114,000 | $249,884 | - | $2,927 | $366,811 |
| 2014 | $111,000 | - | $249,529 | - | $360,529 |

Defendant Irani is a citizen of California.

28.     Defendant Patricia Mulroy ("Mulroy") is a Wynn director and has been since October 2015.  Defendant Mulroy is a member of Wynn's Compliance Committee and has been since at least March 2017; a member of the Audit Committee in at least January 2019; and was also a member of the Compensation Committee in at least March 2016.  Defendant Mulroy knowingly or recklessly: (i) failed

to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents; and (viii) improperly rejected the Demand.  While in possession of material, nonpublic information concerning Wynn's true business health, defendant Mulroy sold 2,226 shares of her Wynn stock for $285,106.08 in proceeds.  Wynn paid defendant Mulroy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $119,065 | $249,955 | - | - | $369,020 |
| 2016 | $118,500 | $249,963 | - | $3,839 | $372,302 |
| 2015 | $22,113 | - | $223,162 | - | $245,275 |

Defendant Mulroy is a citizen of Nevada.

29.  Defendant Clark T. Randt, Jr. ("Randt") is a Wynn director and has been since October 2015.  Defendant Randt knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be

awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents; and (viii) improperly rejected the Demand.   While in possession of material, nonpublic information concerning Wynn's true business health, defendant Randt sold 3,000 shares of his Wynn stock for $387,000 in proceeds.   Wynn paid defendant Randt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $72,000 | $249,955 | - | - | $321,955 |
| 2016 | $73,500 | $249,963 | - | $3,839 | $327,302 |
| 2015 | $14,081 | - | $223,162 | - | $237,243 |

Defendant Randt is a citizen of Florida.

30.     Defendant Jay L. Johnson ("Johnson") is a Wynn director and has been since August 2016.  Defendant Johnson was also a member of Wynn's Compensation Committee from at least March 2017 to at least April 2018.  Defendant Johnson knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the

Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents; and (viii) improperly rejected the Demand. Wynn paid defendant Johnson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $97,500 | $249,955 | - | $347,455 |
| 2016 | $31,935 | - | $349,000 | $380,935 |

Defendant Johnson is a citizen of Idaho.

31.    Defendant Marc D. Schorr ("Schorr") was Wynn's Chief Operating Officer from June 2002 to June 2013 and a director from July 2010 to December 2012.  Defendant Schorr was also a director of Wynn Macau, Limited from September 2009 to March 2013.  Defendant Schorr was a member of Wynn's Corporate Compliance Committee in at least March 2013.  Defendant Schorr knowingly, recklessly, or with gross negligence: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; and (v) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents.  Defendant Schorr is a citizen of Nevada.

32.    Defendant J. Edward Virtue ("Virtue") was a Wynn director from November 2012 to May 2018.  Defendant Virtue was the Chairman of Wynn's Compensation Committee from at least March 2014 to at least April 2018 and a member of that committee from at least March 2013 to at least April 2018.  Defendant Virtue knowingly or recklessly: (i) failed to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from

engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowed a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failed to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowed defendant S. Wynn to retain his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) made or allowed the Company to make improper statements in Wynn's press releases, public filings, and Proxy Statements concerning the Company's operations and compliance policies; and (vii) violated the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents.  Wynn paid defendant Virtue the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $124,500 | $249,955 | - | - | $374,455 |
| 2016 | $127,500 | $249,963 | - | $7,010 | $384,473 |
| 2015 | $126,000 | $249,884 | - | $2,927 | $378,811 |
| 2014 | $123,000 | - | $249,529 | - | $372,529 |

Defendant Virtue is a citizen of New York.

33.   Defendant Cootey was Wynn's CFO and Senior Vice President from May 2014 to March 2017; Treasurer from February 2014 to March 2017; and Senior Vice President of Finance from January 2014 to May 2014.  Defendant Cootey is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Cootey knowingly, recklessly, or with gross negligence: (i) made improper statements in Wynn's press releases and public filings concerning the Company's operations and compliance policies; (ii) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; and (iii) violated the Company's Guidelines, Code of Conduct, and other duties required of Wynn executives as set forth in the Articles and other corporate governance documents.  Wynn paid defendant Cootey the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $175,481 | - | - | - | - | $175,481 |
| 2016 | $625,000 | - | - | $625,000 | $49,115 | $1,299,115 |
| 2015 | $625,000 | - | - | $500,000 | $61,406 | $1,186,406 |
| 2014 | $587,307 | $625,000 | $3,958,800 | - | $125,746 | $5,296,853 |

Defendant Cootey is a citizen of Nevada.

34. Defendant Billings is Wynn's CFO and Treasurer has been since March 2017. Defendant Billings is also a director of Wynn Macau, Limited and has been since August 2018. Defendant Billings is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Billings knowingly, recklessly, or with gross negligence: (i) made improper statements in Wynn's press releases and public filings concerning the Company's operations and compliance policies; (ii) allowed excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; and (iii) violated the Company's Guidelines, Code of Conduct, and other duties required of Wynn executives as set forth in the Articles and other corporate governance documents. Wynn paid defendant Billings the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $624,423 | $3,981,300 | $900,000 | $126,570 | $5,632,293 |

Defendant Billings is a citizen of Nevada.

35. The defendants identified in ¶¶20-22, 31, 33-34 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶20-21, 23, 32 are referred to herein as the "Director Defendants." The defendants identified in ¶¶23-26 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶26, 28 are referred to herein as the "Compliance Committee Defendants." The defendants identified in ¶¶23-25, 27-28, 30, 32 are referred to herein as the "Compensation Committee Defendants." The defendants identified in ¶¶21-25, 28-29 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶20-34 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

36.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Wynn and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Wynn in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Wynn and not in furtherance of their personal interest or benefit.

37.     To discharge their duties, the officers and directors of Wynn were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Wynn were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements— including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     refrain from engaging in acts of self-dealing to enrich themselves at the expense of the Company and its investors;

(e)     remain informed as to how Wynn conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)     truthfully and accurately guide investors and analysts as to the business operations

of the Company at any given time.

**Wynn's Guidelines and Code of Conduct Impose Additional Responsibilities on the Individual Defendants**

38.    To assist the Board in the exercise of its responsibilities, Wynn adopted the Corporate Governance Guidelines (the "Guidelines").  The Guidelines, in effect during relevant times, provide that the Board is responsible for "oversee[ing] the management of the Company and its business."  The Board's stated goals, as articulated in the Guidelines, "are to build value for the Company's stockholders and to promote the vitality and sustainability of the Company for its customers, employees and the other individuals and organizations that depend on the Company."  To achieve these goals, the Guidelines provide that "the Board monitors the performance of the Company (in relation to its goals, strategy, risks and competitors) and, through the Compensation Committee, evaluates and addresses the performance of management, including the Chief Executive Officer."

39.    In addition to the duties described above, the Company vouched to conduct its business in accordance with applicable laws and regulations.  To that effect, the Company maintained an internal Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all of the officers, directors, and employees of the Company.  The stated purpose of the Code of Conduct is not only "to comply with federal securities laws and the marketplace rules of The Nasdaq Global Select Market, but also to reinforce and enhance the Company's commitment to an ethical way of doing business."  As defendant S. Wynn emphasized in his cover letter to employees: "Our goal is not just to comply with the laws, rules and regulations that apply to our business; we also continuously strive to abide by high standards of ethical business conduct."

40.    Among other things, the Code of Conduct mandates that the Individual Defendants' activities comply with the law.  The Code of Conduct also emphasizes the Company's commitment to compliance with all state and federal employment laws and specifically states that "[h]arassment or discrimination of any sort will not be tolerated."  Moreover, the Code of Conduct states that the Individual Defendants "are expected to dedicate their best efforts to advancing the Company's interests and to make decisions that affect the Company based on the Company's best interests, independent of outside influences."  Specifically, the Code of Conduct states:

## 2.1 Compliance With Laws, Rules And Regulations

You are required to comply with the laws, rules and regulations that govern the conduct of our business. No one is expected to know the details of all applicable laws, but you should be knowledgeable about specific laws, rules and regulations that apply to your areas of responsibility. If you have questions about the applicability or meaning of a law, rule or regulation, or if you have any questions regarding whether particular conduct is proper, you should consult the Legal Department.

The Company operates in more than one country and interacts with many different cultures. What is appropriate in some parts of the world may be entirely inappropriate or even unlawful in others. You should always abide by the laws, rules and regulations of the country in which you are conducting business, the federal law of the United States of America and applicable laws of the State of Nevada, the Commonwealth of Massachusetts and the Macau Special Administrative Region. You should also abide by generally accepted business practices of the countries in which you are conducting business, unless they conflict with any of the foregoing laws, rules and regulations, in which case you are to abide by the law. If there is a conflict between local laws and this Code or any other law applicable to the conduct of the Company's business, you should consult with the Legal Department before taking any action.

## 2.2 Promoting a Diverse and Productive Workforce

The Company is an equal opportunity employer committed to complying with all state and federal fair employment practice laws, as well as maintaining a workforce that reflects the diversity of the community. The Company believes in and supports equal opportunity in employment to all persons regardless of race, color, national origin, citizenship status, sex, marital status, gender identity or expression, sexual orientation or perceived sexual orientation, age, religion, veteran status, military status, disability, history of disability or perceived disability. ***Harassment or discrimination of any sort will not be tolerated.***

41.     In addition, the Code of Conduct explicitly prohibits insider trading.  With respect to insider trading, the Code of Conduct states:

## 5.5 Insider Trading

You are prohibited by the Company's Insider Trading Policy and the law from buying or selling securities of any company at a time when you are in possession of "material non-public information" about that company. This conduct is known as "insider trading." The prohibition on insider trading applies to Company securities and to securities of other companies if you learn material non-public information about other companies, such as the Company's suppliers or tenants, in the course of your duties for the Company. Communicating material non-public information about a company to someone who may buy or sell the company's securities - known as "tipping" - is also illegal. Federal and international law enforcement officials have sophisticated techniques for identifying insider trading and tipping and vigorously enforce these laws regardless of where the activity occurs or the amount involved.

Information is "material" if (a) there is a substantial likelihood that a reasonable investor would find the information "important" in determining whether to trade in a security; or (b) the information, if made public, likely would affect the market price of a company's securities.

Information is considered to be non-public unless it has been disclosed and broadly disseminated to the public by the Company, which means that the information must be publicly disclosed by the Company through appropriate channels (such as by means of a filing with the Securities and Exchange Commission, a press release or a widely disseminated statement from a senior officer) and adequate time (generally at least a full trading day) must have passed for the securities markets to digest the information.

Insider trading is a crime punishable by civil penalties of up to three times the profit gained or losses avoided on a transaction, criminal fines of up to $5 million, and up to 20 years in prison. Companies may also face civil penalties, up to the greater of over $1 million or three times the profit gained or losses avoided, for insider trading violations by their employees and other agents. "Tipping" can result in the same civil and criminal penalties that apply if an individual engages in insider trading directly, even if the individual does not receive any money or derive any benefit from trades made by others to whom the individual passed material non-public information.

**Wynn's Sexual Harassment Policy and Personal Relationships Policy**

42.     According to an administrative complaint filed by the Nevada Gaming Control Board in January 2019, during all relevant times, the Company maintained a policy concerning sexual harassment.  The Company's harassment policy was "to prohibit any conduct, whether intentional or unintentional which results in the harassment or discrimination of employees…," and specifically included sexual harassment as one type of harassment.  The harassment policy defined sexual harassment as "any unwelcomed sexual advances, requests for sexual favors, or other conduct of a sexual nature either verbal or physical…."  Among other things, Wynn's sexual harassment policy required that supervisors who observe or become aware of sexual harassment immediately report such harassment "to the Employee Relations department and take appropriate steps to stop the offending behavior."

43.     The Company also maintained a personal relationships policy during relevant times.  This policy discouraged "romantic or intimate relationships involving a direct or indirect supervisory relationship between employees regardless of whether the relationship is voluntary and/or welcomed by both parties."  Wynn's personal relationships policy further explained that: "Department managers are responsible for

conducting themselves in a professional manner and strictly maintaining professional relationships with their employees at all times."

44. During all times relevant to this complaint, Wynn maintained a policy setting out how the Company's Employee Relations Department should investigate alleged workplace conduct violations. Specifically, the Employee Relations Department was required to:

> 1. Obtain verbal and written statements from all parties involved, including the complainant and accused. 2. Take photographs/video of any injury or damage *(if applicable)*. 3. Preserve all evidence, and secure the evidence in a locked location. Document all evidence obtained. 4. Determine if there is a potential for risk occurrence. If there is a potential, take all measures appropriate to protect employees. 5. Complete an investigation report and provide all relevant and necessary information, including findings.

The Company's investigations policy also set out that the Employee Relations Department should make and document findings as "violation found," "no violation found," or "inconclusive investigation."

**Additional Fiduciary Duties of the Audit Committee Defendants**

45. Under the Wynn Board's Audit Committee Charter, the Audit Committee Defendants, defendants Hagenbuch, Miller, Shoemaker, and Wayson, owe and/or owed specific additional duties to Wynn. According to the Audit Committee Charter in effect during relevant times, among other things, the Audit Committee is responsible for assisting the Board in overseeing: (i) the Company's compliance with legal and regulatory requirements; (ii) the accounting and financial reporting processes of the Company, including the Company's financial statement audits and the integrity of the Company's financial statements; and (iii) the performance of the Company's internal audit function. In laying out the Audit Committee's responsibilities in connection with its oversight of Wynn's compliance with legal and regulatory requirements, the Audit Committee Charter states:

> **D. Compliance; Risk Oversight**
>
> - Oversee the Corporation's compliance program with respect to legal and regulatory compliance, and oversee the Corporation's policies and procedures for monitoring compliance.
>
> - Review from time to time and make recommendations to the Board with respect to the Corporation's Code of Business Conduct and Ethics and other policies relating to management conduct, and oversee procedures and practices to promote compliance therewith. Such policies shall include, without limitation, those

relating to (i) transactions between the Corporation and members of its management, (ii) political contributions and other sensitive payments, (iii) compliance with the Foreign Corrupt Practices Act, and (iv) corporate or competitive opportunities offered to or enjoyed by members of management.

- Review at least annually the implementation and effectiveness of the Corporation's compliance program with the General Counsel and the Compliance Officer, who shall have the authority to communicate directly to the Audit Committee promptly, about actual and alleged violations of the Corporation's Code of Business Conduct and Ethics, including any matters involving criminal or potential criminal conduct.

- Discuss periodically with management, receive relevant reports regarding, and oversee management's evaluation of the Corporation's major risk exposures and, without limiting the foregoing, the Corporation's credit, related party, information security, construction and financial risk exposures, and the steps management has taken or proposes to take to monitor and control such exposures.

- Review and approve, related person transactions, as defined in SEC rules, pursuant to the Corporation's Related Person Transaction Policies and Procedures, review and amend those policies and procedures as appropriate, and oversee the Corporation's policies for the review and documentation of other related party transactions governed by applicable accounting standards.

- Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls, auditing and federal securities law matters, including procedures for the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting, auditing and federal securities law matters.

46.     Further, in overseeing the Company's financial reporting processes on behalf of the Board and the integrity of Wynn's financial statements, the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

**B. Financial Statements**

- Prior to their filing with the SEC or other publication, review and discuss with the Corporation's independent auditors and management the Corporation's audited financial statements, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- Based on (i) its review and discussions with management of the Corporation's audited financial statements; (ii) its discussion with the independent auditors of the matters to be communicated pursuant to applicable rules; and (iii) the written disclosures from the Corporation's independent auditors regarding independence,

- 23 -

recommend to the Corporation's Board whether the Corporation's audited financial statements should be included in the with the SEC.

- Prior to their filing with the SEC or other publication, review and discuss with the Corporation's independent auditors and management the information contained in the Corporation's quarterly reports on Form l0-Q, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- Review and discuss with the Corporation's independent auditors and management the Corporation's quarterly earnings releases.

- Review major changes to the Corporation's auditing and accounting policies and practices as suggested by the independent auditors, internal auditors or management.

- Meet periodically with the Disclosure Committee (and quarterly with its chairman) to discuss compliance by the Corporation with legal and regulatory requirements relating to the Corporation's financial statements, and receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Corporation's disclosure controls and procedures.

- Oversee the preparation of a report in accordance with the rules of the SEC to be included in the Corporation's annual proxy statement.

- Review with the Corporation's legal advisers legal matters that may have a material effect on the financial statements, the Corporation's compliance policies and any material reports or inquiries received from regulators or governmental agencies relating to any matter that may have a material effect on the Corporation's financial statements.

47.    Finally, in assisting the Board with oversight of the Company's internal controls and disclosure controls, the Audit Committee Charter states that the Audit Committee is required to:

- Review with the Corporation's independent auditors and financial management the adequacy and effectiveness of the Corporation's system of internal accounting controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Committee by the independent auditors or management.

- Review the scope and results of the Corporation's internal auditing procedures and practices and oversee the effectiveness of the internal audit function, including periodically reviewing and discussing with the Corporation's independent auditors and financial management the responsibilities, budget and staffing of the internal audit function.

**Additional Fiduciary Duties of the Compliance Committee Defendants**

48.     The Company's Board also maintained a Compliance Committee, "to assist the Company in maintaining the highest level of regulatory compliance."   Among other things, the Compliance Committee Defendants, defendants Miller and Mulroy, were tasked with "overseeing the administration of the Company's Gaming Compliance Program."   The Company's April 18, 2018 Proxy Statement describes the function of the Compliance Committee as follows:

> In accordance with Nevada gaming laws, the Company has a Corporate Compliance Committee. The purpose of this committee is to assist the Company in maintaining the highest level of regulatory compliance, including, among other things, overseeing the administration of the Company's Gaming Compliance Program. In their roles as directors, Governor Miller and Ms. Mulroy currently serve as the Chairman and member of this committee, respectively. On February 28, 2018, Jacqui Krum, General Counsel for Wynn Boston Harbor, was appointed to serve on the Corporate Compliance Committee.

**Additional Fiduciary Duties of the Compensation Committee Defendants**

49.     Under the Wynn Board's Compensation Committee Charter, the Compensation Committee Defendants, defendants Wayson, Shoemaker, Hagenbuch, Irani, Mulroy, Johnson, and Virtue, owe and owed specific additional duties to Wynn.   Pursuant to the Compensation Committee Charter, the purpose of the Compensation Committee is to, among other things: (i) "oversee the Corporation's executive compensation and employee benefit plans and practices, including its incentive-compensation and equity-based plans"; (ii) "to oversee the evaluation of the Corporation's senior management"; and (iii) "to review and discuss with management the Corporation's compensation discussion and analysis…."   The Compensation Committee is required to review and approve the compensation for Wynn's executive officers, including annual base salaries, the annual incentive opportunities, the long-term incentive opportunities, and any special or supplemental benefits. In addition, the Compensation Committee is required to approve "all aspects of the Chief Executive Officer's compensation, including setting annual and long-term goals for the Chief Executive Officer" and "annually evaluating the Chief Executive Officer's performance against these goals."

**Breaches of Duties**

50.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Wynn, the absence of good faith on

their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

51.      The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in a systemic and widespread pattern and practice of sexual harassment.   In addition, despite knowledge of defendant S. Wynn's inappropriate behavior, the Board refused to take any action to address the misconduct.   Rather, the Board allowed defendant S. Wynn to remain on the Board and continue in his employment as CEO.   The Individual Defendants further breached their fiduciary duties by failing to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to alert them to the hostile work environment created by defendant S. Wynn's widespread sexual harassment.   Finally, the Individual Defendants also breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to disseminate improper statements to the public and the Company's stockholders.   These improper practices wasted the Company's assets, and caused Wynn to incur substantial damage.

52.      The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings.   The Audit Committee Defendants breached their duties of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Wynn's public statements and internal control function.

53.      The Compliance Committee Defendants had a duty to ensure the Company maintained the highest level of regulatory compliance.   The Compliance Committee Defendants breached their duties of loyalty and good faith by failing to ensure that the Company was operated in compliance with the law.

54.      The Compensation Committee Defendants reviewed and approved defendant S. Wynn's compensation.   The Compensation Committee Defendants breached their duties of loyalty and good faith by approving defendant S. Wynn's excessive compensation, despite his rampant pattern and practice of sexual harassment.

55.      The Insider Selling Defendants breached their duty of loyalty by selling Wynn stock on the basis of the knowledge of the improper information described herein before that information was

revealed to the Company's stockholders.  The information described herein was material, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Wynn common stock.

56.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Wynn, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage Wynn has already incurred, Wynn has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Wynn, as to the Company's operations and compliance policies; (ii) facilitate the Insider Selling Defendants' illicit sale of over $56 million worth of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Wynn and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

59.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper statements.

60.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants'

violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**FACTUAL BACKGROUND AND REGULATORY REQUIREMENTS
APPLICABLE TO THE COMPANY'S OPERATIONS**

63.     Wynn develops, owns, and operates destination casino resorts that integrate hotel accommodations and a wide range of amenities, including fine dining outlets, premium retail offerings, and entertainment theatres.  The Company's operations are governed by various laws and strict regulatory requirements related to the gaming industry in the states and countries in which it does business.  The Company operates Wynn Las Vegas and Encore in Las Vegas, Nevada, and Wynn Macau and Wynn Palace in Macau, China, and is currently constructing a new $2.4 billion property in Everett, Massachusetts, called Wynn Boston Harbor.  Each of these jurisdictions require the Company, including its officers, directors, and other representatives, to be "suitable" in order to obtain and keep its respective licenses.

64.     Nevada law imposes comprehensive regulatory requirements upon gaming licensees, including obligations that those associated with the licensee possess the necessary character, qualifications, and integrity, to be suitable to hold that privilege so as not to pose a threat to the public interest or the integrity of the regulation and control of gaming.  In particular, the Nevada Gaming

Regulations provide:

> **5.011 Grounds for disciplinary action**. The board and the commission deem any activity on the part of any licensee, his agents or employees, that is inimical to the public health, safety, morals, good order and general welfare of the people of the State of Nevada, or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry, to be an unsuitable method of operation and shall be grounds for disciplinary action by the board and the commission in accordance with the Nevada Gaming Control Act and the regulations of the board and the commission. Without limiting the generality of the foregoing, the following acts or omissions may be determined to be unsuitable methods of operation:
>
> 1. Failure to exercise discretion and sound judgment to prevent incidents which might reflect on the repute of the State of Nevada and act as a detriment to the development of the industry.
>
> \*       \*       \*
>
> 5. Catering to, assisting, employing or associating with, either socially or in business affairs, persons of notorious or unsavory reputation … or the employing either directly or through a contract, or any other means, of any … individual in any capacity where the repute of the State of Nevada or the gaming industry is liable to be damaged because of the unsuitability of the ... individual….
>
> \*       \*       \*
>
> 10. Failure to conduct gaming operations in accordance with proper standards of custom, decorum and decency, or permit any type of conduct in the gaming establishment which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry.

65.     Massachusetts law also imposes comprehensive regulatory requirements upon gaming licensees, including obligations that those associated with the licensee possess the necessary character, qualifications, and integrity to be suitable to hold that privilege so as to not pose a threat to the public interest or the integrity of the regulation and control of gaming.  Specifically, the Massachusetts gaming regulations require the Massachusetts Gaming Commission to "consider the overall reputation of the applicant including, without limitation ... (1) the integrity, honesty, good character and reputation of the applicant."  M.G.L. 23K §12.  The regulations further require the Massachusetts Gaming Commission to "deny an application for a gaming license ... if the applicant ... (ii) submitted an application for a license under this chapter that contains false or misleading information; [or] (iii) committed prior acts which have not been prosecuted or in which the applicant was not convicted but form a pattern of misconduct that makes the applicant unsuitable for a license…."  *Id.* §16.

66.     Likewise, Macau law also imposes comprehensive regulatory requirements upon gaming licensees.   Macau Special Administration Region Administrative Regulation No. 6/2002 requires prospective licensees to duly evidence their reputation and suitability.   Articles 14 and 15 of Macau Special Administration Region Law No. 16/2001 require licensees to demonstrate, among other things, repute and probity, which must be maintained and verified throughout the twenty-year duration of the gaming license.   Further, under the Administrative Regulation No. 6/2002, all directors and stockholders holding at least 5% of the gaming operator's corporate capital, as well as key employees, are subject to monitoring for suitability by the Macau Gaming Inspection and Coordination Bureau.

## DEFENDANT S. WYNN'S DECADES-LONG PATTERN OF SEXUAL HARASSMENT AND ABUSE

**Defendant S. Wynn's History of Sexual Misconduct**

### Defendant S. Wynn Engages in Inappropriate Conduct with Female Employees at the Golden Nugget While Running the Casino

67.     Defendant S. Wynn's long history of sexual harassment and abuse spans decades, predating the founding of the Company.   According to two recently filed police reports, defendant S. Wynn's serial sexual harassment dates back to the 1970s.   In one, a woman recently reported to St. Louis, Missouri, police that defendant S. Wynn sexually assaulted her in Las Vegas, Nevada, in the 1970s.   In the other, another woman reported to the Las Vegas Police Department that defendant S. Wynn assaulted her in Chicago, Illinois, also in the 1970s.

68.     Former employees of the Golden Nugget, a Las Vegas casino of which defendant S. Wynn was a majority owner in the 1970s and 1980s, also allege they were sexually harassed by defendant S. Wynn.   In an article in the *Nevada Forward*, a cocktail waitress at the Golden Nugget in the 1980s described defendant S. Wynn as forceful and aggressive in his advances.   The former cocktail waitress recalled that defendant S. Wynn would request that she leave work early and go over to his house, and explained that while she tried to avoid his advances, since her livelihood depended on him, she often had no choice but to acquiesce to his demands: "Did I want to have sex with him? No. He signed my checks. I had two little kids, and no child support. He made a habit of going after single moms who were scared and couldn't afford to lose their jobs."

69.     Likewise, a *WSJ* article reported that Shawn Cardinal ("Cardinal"), a personal assistant to Elaine Wynn in the 1980s, defendant S. Wynn's wife at the time, recalled that defendant S. Wynn routinely asked her to spend time with him outside of work.  According to Cardinal, while she routinely rebuffed these advances, telling defendant S. Wynn she had plans with her husband and child, these advances continued.  Cardinal stated that defendant S. Wynn would call her on the phone to ask what she was wearing and why she did not hang out with him after work.

70.     Defendant S. Wynn's systemic sexual harassment during this period is corroborated by deposition testimony by Dennis Gomes ("Gomes"), an executive at the Golden Nugget when defendant S. Wynn ran the casino.  According to a *WSJ* article, in the early 1990s, Gomes testified that he "routinely received complaints from various department heads regarding ***Wynn's chronic sexual harassment of female employees***."  Gomes described defendant S. Wynn's "disgraceful pattern of personal and professional conduct," that included S. Wynn directing Gomes to obtain home phone numbers from cocktail waitresses.

**Defendant S. Wynn Sexually Harasses a Number of Female Employees at the Mirage While Running the Casino, Putting the Board on Notice of His Misconduct**

71.     On May 23, 1997, eleven waitresses at the then Wynn-owned Mirage in Las Vegas filed a lawsuit in the U.S. District Court for the District of Nevada, against the Mirage, alleging that defendant S. Wynn created a culture of harassment, coerced sexual relations, and engaged in other inappropriate behavior.[1]  The women in the lawsuit stated that supervisors at the Mirage failed to protect female employees from gamblers who harassed them and waitresses were often asked to sexually "accommodate" high rollers at the resort.  The lawsuit also alleged that defendant S. Wynn told waitresses at the Mirage that they had "fat asses," did not look good in their uniforms, and that they were required to maintain their weight at the time they were hired throughout their employment.  Specifically, the complaint states that in 1995, defendant S. Wynn met with cocktail waitresses employed by the Mirage to warn them that unless they lost weight, they would no longer be allowed to be cocktail

---

[1] *See Arrowsmith, et al. v. Mirage Casino-Hotel*, No. 2:97-cv-00638-RLH-LRL (D. Nev. 1997) (hereinafter "*Arrowsmith*").

waitresses.  A few days later, defendant S. Wynn had the cocktail waitresses weighed and measured and forced them each to sign a document stating that if they gained six pounds or more they would be put on probation.

72.     In 2003, Mirage settled the case with the plaintiffs in *Arrowsmith*.  Since the case is public record, and involved Wynn's CEO and Chairman, each of Wynn's Board members either knew of or should have been aware of the litigation and the need to ensure that the Company instilled appropriate internal controls to prevent defendant S. Wynn from engaging in similar inappropriate behavior with Wynn employees.  This is particularly true for defendants Shoemaker, Wayson, and Miller, who were all on the Board in 2003.  Furthermore, at the same time *Arrowsmith* was being litigated, defendant Wayson was a director of Mirage Resorts, Inc., and therefore is presumed to have been aware of the plaintiff's allegations against defendant S. Wynn in that action.

**Defendant S. Wynn's Sexual Misconduct Continues at Wynn Las Vegas**

### Defendant S. Wynn Creates a Hostile Work Environment for Female Employees at Wynn Las Vegas

73.     In 2005, defendant S. Wynn opened his flagship resort, Wynn Las Vegas.  According to a *WSJ* article, shortly thereafter, defendant S. Wynn began sexually assaulting and harassing female Wynn employees.  With his repeated and unwanted sexual advances, defendant S. Wynn created a hostile working environment where female employees were constantly uncomfortable.

74.     In a January 26, 2018 *WSJ* article, several former Wynn Las Vegas employees recalled that defendant S. Wynn often walked around the grounds of the resort in short shorts without underwear.  One former Wynn employee recalled that at one point defendant S. Wynn repeatedly rubbed his genitals in front of her, which were falling out of his shorts, while making explicit comments about things he wanted to do with her sexually.  According to the former employee, during various other encounters, defendant S. Wynn asked if he could kiss her, and one time asked, "So when are you going to come into my office and [have intercourse]?"  On another occasion, the former employee stated that, as she was leaving defendant S. Wynn's office, he grabbed her waist as she stood against a wall and demanded she kiss him.  The *WSJ* reported that the former employee's supervisor and another colleague confirmed being informed of these advances at the time, but said they sought to "manage" the situation rather than

1  report it for fear of repercussions.

2      75.    Former Wynn employees also recalled defendant S. Wynn's inappropriate behavior with

3  pedicurists and manicurists at the Last Vegas resort.  When getting pedicures at the resort's salon, former

4  employees claim defendant S. Wynn would sit in a way so as to expose his genitals.  Manicurists at the

5  salon were also a frequent target of defendant S. Wynn's sexual assaults.  The *WSJ* reported that in 2005,

6  a manicurist who worked at the Las Vegas resort informed a colleague that defendant S. Wynn had

7  forced her to have sexual relations with him.  After the manicurist's supervisor filed a detailed report

8  with Wynn's Human Resources Department, the manicurist received a call from Doreen Whennen

9  ("Whennen"), the Vice President of Hotel Operations at Wynn Las Vegas at the time, who reprimanded

10  her for filing a report with Human Resources rather than taking the matter directly to Whennen.

11  Defendant S. Wynn ultimately paid the manicurist $7.5 million to settle the allegations.  According to

12  media reports, defendant S. Wynn attempted to conceal the assault and settlement by creating a secret

13  limited liability company, Entity Y, to make the $7.5 million settlement payment.

14      76.    Massages at Wynn Las Vegas were also a hotbed for defendant S. Wynn's sexual

15  assaults.  In the *WSJ* article, one former massage therapist at Wynn Las Vegas said that several years

16  ago, defendant S. Wynn booked multiple appointments a week with her in the private massage room in

17  his office suite.  She recalled that at these appointments defendant S. Wynn would continually adjust a

18  towel to expose himself, and at one session, threw it off saying, "Just get this thing off of me."  The

19  former massage therapist stated that defendant S. Wynn ultimately instructed her to masturbate him and

20  that she had no choice but to agree to his requests because he was her boss.  According to the masseuse,

21  for several months, this was a frequent part of their massage sessions.  In subsequent sessions, the

22  former employee explained that defendant S. Wynn asked her to perform oral sex on him and described

23  in detail how he wanted it done.

24      77.    Another former masseuse at Wynn Las Vegas recalled defendant S. Wynn making

25  similar inappropriate advances while she massaged him in his office's private massage room.  This

26  former Wynn employee told the *WSJ* that defendant S. Wynn would remove his towel and, while she

27  massaged the front of his thighs, would tell her to "go higher," meaning touch his genitals.

28

78.     Former employees interviewed by the *WSJ* explained that they would enter fake appointments in the books to help other female massage therapists get around a request for services in defendant S. Wynn's private massage room or arrange for other masseurs to pose as assistants to avoid being alone with him.  Former employees also recalled female employees hiding in the bathroom or back rooms when they heard defendant S. Wynn was heading to the salon.  "Everybody was petrified," said Jorgen Nielsen ("Nielsen"), a former artistic director at the salon.  Nielsen said he and others repeatedly told high-ranking company executives that defendant S. Wynn's sexual advances were causing a problem, but "nobody was there to help us."

**Defendant S. Wynn's Pattern of Sexual Assault Subjected the
Company to a Number of Lawsuits**

79.     After media outlets began reporting on defendant S. Wynn's improprieties, in early 2018, three former female Wynn employees filed lawsuits against defendant S. Wynn, the Company, and several Wynn directors and executives that they claim facilitated defendant S. Wynn's misconduct.  In addition, on January 25, 2019, the Nevada Gaming Control Board, after conducting an extensive investigation into the Company and defendant S. Wynn, filed an administrative complaint with the Nevada Gaming Commission revealing new allegations against defendant S. Wynn and the Company's executives' lack of response thereto (the "NGCB Complaint").

80.     In a complaint filed on February 28, 2018, a former masseuse at Wynn Las Vegas alleged that defendant S. Wynn began assaulting her in or around 2011.  According to the complaint, defendant S. Wynn made unwanted sexual advances and "relentlessly pursued sexual intercourse with [her], through innumerable verbal propositions for sex and countless comments about [her] physical appearance and his desire for sex."  In her lawsuit, the masseuse explained that while she "consistently objected" to his advances, defendant S. Wynn "mentally and emotionally" manipulated her into performing sexual acts on him by exploiting her financial dependency on her job.  Following the massage sessions, the woman explained that defendant S. Wynn would "tip" her $1,000.  In addition to the allegations against defendant S. Wynn, the lawsuit accuses the Board of facilitating the misconduct by knowingly failing to take action to prevent defendant S. Wynn's "predatory behaviors."

81.     In a second lawsuit, filed on March 1, 2018, against the Company, defendant S. Wynn, and certain of the Director Defendants, another former Wynn Las Vegas massage therapist made substantially similar accusations to those in the above-mentioned lawsuit.  The plaintiff in the March 1, 2018 lawsuit claimed that in or around 2006, defendant S. Wynn regularly began booking appointments for massages with her.  The massages took place in defendant S. Wynn's office at Wynn Las Vegas, while the door to his office was locked and guarded by security personnel and dogs.  According to the complaint, while the first couple of massages were "routine," defendant S. Wynn began asking calculated questions to discover any weaknesses he could exploit, such as her financial dependency on keeping her job, and he began "leveraging his immense power to coerce [her] to perform sexual favors." Among other things, after learning that the masseuse was financially dependent on her job at Wynn Las Vegas, defendant S. Wynn: (i) instructed the massage therapist to no longer place a towel over his genitals during massages; (ii) would demand that she massage his genitals; and (iii) repeatedly made unwanted sexual advances towards her.  According to the complaint, defendant S. Wynn pressured the masseuse to perform sexual acts with her hands and demanded oral sex more than fifty times over the course of two to three years.  After these sessions, defendant S. Wynn routinely "tipped" the woman $400.

82.     A third lawsuit concerning defendant S. Wynn's sexual harassment was filed by a Wynn Las Vegas manicurist on March 6, 2018, against defendant S. Wynn, certain of the Director Defendants, and the Company.  According to the March 6, 2018 complaint, defendant S. Wynn began sexually harassing and assaulting her around 2015, when she began performing regular manicures for him.  The manicurist stated that during manicures, defendant S. Wynn would demand that she sit extremely close to him and intertwine their legs so that the woman's knee was touching defendant S. Wynn's crotch.  The plaintiff in that action also asserted that "[o]n several occasions when Plaintiff began to manicure WYNN's hands, WYNN would place the hand being manicured over his genitals, thereby making Plaintiff contact his genitals through his pants."  After the manicurist complained to her supervisor and upper management at Wynn of the unwanted sexual advances, Wynn's management indicated that while her complaints had been taken to the Company's highest executives, no action would be taken to end defendant S. Wynn's inappropriate behavior.

83.     The NGCB Complaint corroborated the allegations contained in the above complaints. For example, the Nevada Gaming Control Board, after conducting an extensive and thorough investigation of the Company and defendant S. Wynn, determined that in 2014 alone at least three employees who worked at Wynn's Encore Spa reported sexual harassment by defendant S. Wynn to the hotel's management.   While these allegations were communicated among other members of Wynn's management and certain executives, not one of the persons aware reported the allegations to Employee Relations, or otherwise ensured that the allegations had been reported thereto, as required by the Company's policies and procedures in effect at the time.

84.     The NGCB Complaint also confirmed the extent to which Wynn's high-level executives were made aware of defendant S. Wynn's inappropriate conduct—but chose to look the other way rather than investigate.   Among other things, the Nevada Gaming Control Board's investigation found that at least four former Company executives failed to initiate an investigation into defendant S. Wynn's misconduct despite learning that an employee at the salon had alleged he raped and impregnated her.   In particular, defendant Schorr, Whennen, and Arte Nathan ("Nathan"), former Wynn Senior Vice President and Chief Human Resources Officer, each learned about these allegations at or around the time they were made, but failed to take any action.   The Nevada Gaming Control Board's investigation also concluded that by January 2012, at the latest, defendant Sinatra was aware of the $7.5 million settlement resulting from these allegations, and that she was aware that the allegations specifically involved rape by at least July 2017.   As a result of these executives' conscious failure to initiate or conduct an investigation, or take any other remedial action despite learning of the sexual misconduct allegation, the Company violated various provisions of the Nevada Gaming Control Act and Nevada Gaming Commission Regulations.

85.     In addition, the NGCB Complaint revealed additional sums defendant S. Wynn had paid to settle allegations of sexual misconduct against him.   In particular, the NGCB Complaint disclosed that in 2006, defendant S. Wynn entered into a $975,000 private settlement with a former cocktail server at Wynn Las Vegas after she claimed he "pressured her into a nonconsensual sexual relationship" with him

1    (the "2006 Settlement").[2]  The Nevada Gaming Control Board's investigation found that while defendant

2    Schorr, Nathan, and Kevin Tourek ("Tourek"), Wynn's former General Counsel, were each aware of the

3    cocktail server's allegations against defendant Wynn in 2006, not one of these executives took any

4    action to investigate the allegations.

5          86.    Other allegations corroborated by the regulators involved defendant S. Wynn's

6    inappropriate relations with cocktail servers at Wynn.  Multiple persons interviewed by the Nevada

7    Gaming Control Board during its investigation reported that a Wynn employee had facilitated sexual

8    relationships between cocktail servers and defendant S. Wynn or his guests.  While Nathan was aware of

9    rumors that this employee was facilitating the sexual relationships referred to above, Nathan entirely

10   failed to investigate the rumors or even report the rumors to Employee Relations, so the department

11   could conduct an investigation.  Likewise, Tourek failed to report to Employee Relations that he had

12   received an e-mail in 2007, stating that a former executive "loves sleeping with cocktail servers," or

13   investigate the misconduct.

14         87.    The Nevada Gaming Control Board also uncovered previously undisclosed instances of

15   defendant S. Wynn's sexual improprieties.  As revealed by the NGCB Complaint, in 2014, a former

16   Wynn Las Vegas cocktail server and flight attendant alleged that defendant S. Wynn engaged in sexual

17   misconduct against her in 2005.  According to the NGCB Complaint, although both Tourek and Maurice

18   Wooden, a former Wynn President, were both well aware of the allegations, neither investigated the

19   alleged misconduct.   The Nevada Gaming Control Board's investigation also disclosed new allegations

20   against defendant S. Wynn by a former flight attendant with LV Jet, LLC ("LV Jet"), a wholly owned

21   Wynn subsidiary.   According to the NGCB Complaint, the flight attendant submitted written

22   correspondence to defendant S. Wynn dated October 27, 2016, in which she alleged that defendant S.

23   Wynn "engaged in sexual harassment with multiple LV Jet flight attendants."  Although defendant S.

24   Wynn's personal assistant forwarded the correspondence to both defendant Sinatra and Stacie Michaels,

25   Wynn's former General Counsel, neither reported the allegations to Employee Relations, nor ensured

26

27   [2] While the *WSJ* previously reported the existence of the settlement, the amount had not been publicly
     disclosed.

28

that the allegations had been reported thereto, as required by the Company's policies and procedures in effect at the time.

88.      The NGCB Complaint emphasized that the "internal control breakdowns that occurred in relation to allegations of misconduct" were attributable to "the ability of former WYNN executives to operate outside of Company policies and procedures."  In particular, the NGCB Complaint noted that the Company's policies and procedures requiring employee attendance at annual compliance training were not applied to defendant S. Wynn.  Nor were the Company's policies and procedures pertaining to conflicts of interest followed for a number of settlements, including the $7.5 million settlement and the 2006 Settlement.  Policies and procedures concerning the reporting of sexual harassment and related matters by executives and management were also not enforced.   The NGCB Complaint concluded that Company's failure to enforce its policies and procedures allowed defendant S. Wynn's rampant sexual harassment to go uninvestigated, and thus continue unimpeded, for a number of years.

**THE DIRECTOR DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO INVESTIGATE ALLEGATIONS OF INAPPROPRIATE CONDUCT BY DEFENDANT S. WYNN DESPITE THEIR KNOWLEDGE THEREOF, AND FAILING TO PROTECT COMPANY EMPLOYEES FROM HIS ABUSE**

89.      Through their lack of oversight and complete deference to defendant S. Wynn, the Board allowed defendant S. Wynn to create a culture at Wynn that was antithetical to the Company's stated core values.  The Board's complete failure to exercise independent oversight permitted a culture of rampant and obvious sexual harassment and exploitation to continue unabated for more than a decade. It was not until the *WSJ* reported on allegations of sexual misconduct by defendant S. Wynn against a number of women, that the Board was forced to address defendant S. Wynn's decades-long sexual harassment.  Even then, the Board's response was blatantly inadequate.

**The Board Repeatedly Failed to Independently Investigate Allegations of Improper Conduct by Defendant S. Wynn**

90.      By at least March 2016, defendants Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, Maddox, Schorr, and Sinatra were well aware of the 2005 sexual assault allegations

against defendant S. Wynn.[3]   On March 28, 2016, Elaine Wynn filed court documents describing a "multimillion dollar payment" made by defendant S. Wynn following allegations that he engaged in "serious misconduct" "on company property against an employee" and detailed defendant S. Wynn's "reckless, risk-taking" behavior that "left the directors and the Company vulnerable to potential liability and regulatory exposure."[4]   Given that the Company was a party to the ongoing litigation, the Board and the Company's General Counsel, defendant Sinatra, surely would have been apprised of these serious allegations.

91.   According to media reports, the Board was aware of defendant S. Wynn's long-standing pattern of sexual harassment and abuse even earlier.   Media reports explain that Elaine Wynn learned of the 2005 assault and $7.5 million settlement payment in 2009, while she was a member of the Board, and that she reported the information to defendant Sinatra at that time.[5]   According to a CNBC report, Elaine Wynn also reported the 2005 assault and settlement payment to a board representative "right away" after learning of it in 2009.   Further, the Company has admitted that Elaine Wynn informed the Board of the 2005 assault after she lost her Board seat in 2015.

92.   Despite the many red flags alerting the Board to defendant S. Wynn's improprieties, the Director Defendants failed to take any action to remedy the long-standing problems, or even investigate the misconduct.   As Elaine Wynn's attorneys told a Clark County, Nevada, judge on February 13, 2018, there was a "greater concern" at Wynn "to cover up certain things and to make sure [Elaine Wynn] didn't pull the curtain back too far."

93.   Furthermore, even after the *WSJ* article publicly revealed defendant S. Wynn's pattern of sexual harassment and abuse, the Board continued to allow him free reign to intimidate salon employees

---

[3] Defendant Schorr was aware of the 2005 sexual assault allegations even earlier.   Indeed, defendant Schorr learned that the former Wynn manicurist had accused defendant S. Wynn of raping and impregnating her at or around the time the allegations were made.

[4] Defendant Johnson joined the Board in August 2016, while the litigation was ongoing, and therefore would have been put on notice of these serious allegations at that time.

[5] The extensive investigation by the Nevada Gaming Control Board found that defendant Sinatra learned of the 2005 settlement by January 2012, at the latest.

by allowing him to demand that they publicly disavow his misconduct.  Specifically, the former Wynn manicurist's complaint states that on January 31, 2018, defendant S. Wynn accompanied by Wynn executives, went into The Claude Baruk Salon at Wynn Las Vegas (the "Salon") and, in a group setting, instructed anyone who had ever felt assaulted or abused by him to raise their hands.  Then, on or about February 1, 2018, defendant S. Wynn returned to the Salon with audio-video personnel and demanded that all employees record a video in which they stated that he had never assaulted them.

**The Board's Belated and Inadequate Investigation into Defendant S. Wynn's Decades-Long Pattern of Sexual Misconduct**

94.     While the Board had long been aware of defendant S. Wynn's long history of sexual harassment and abuse, only after his improprieties were publicly revealed did the Board make any effort to investigate the misconduct.  On January 26, 2018, the Board announced it had formed a special committee (the "Special Committee") to conduct an internal investigation into defendant S. Wynn's improprieties.  Unfortunately, the Board's investigation was wholly inadequate.

95.     As an initial matter, the Special Committee included Director Defendants Mulroy, Hagenbuch, and Johnson, each of whom is beholden to defendant S. Wynn, and therefore, unable to exercise independent and impartial judgment.  The investigation was headed by defendant Mulroy, a long-time Wynn associate who dealt with defendant S. Wynn for decades as a Nevada state regulator. Prior to her service on the Board, defendant Mulroy served as the General Manager of the Southern Nevada Water Authority during which she served the interests of Las Vegas developers, and defendant S. Wynn in particular.  For example, in 1991, defendant Mulroy placed a moratorium on new water permits in Las Vegas, putting projects that had not yet been approved—including the construction of new casinos—on hold.  In the days following, defendant S. Wynn summoned her into his Las Vegas office, where he told her Las Vegas couldn't attract investors to pay for new development if it could not assure them they would be able to get the most basic permits for their projects.  According to defendant Mulroy: "He wanted to know what the hell was going on." Not long after, defendant Mulroy lifted the moratorium, allowing defendant S. Wynn's planned casino construction to move forward.  An article published by *ProPublica* explained that when defendant Mulroy later rallied the gaming and development companies to conserve water "[defendant S.] Wynn, forever an ally, made phone calls on

1    her behalf, helping to raise funds to further her public relations campaign and fill billboards across Las

2    Vegas with appeals to save water and heed the drought."

3          96.    Defendant Hagenbuch also has long-standing ties to defendant S. Wynn.  On May 7,

4    2018, Elaine Wynn released a letter to Wynn stockholders urging them to refrain from reelecting

5    defendant Hagenbuch to the Board.  In the letter, Elaine Wynn explained that defendant S. Wynn

6    handpicked his friend defendant Hagenbuch to join the Board in 2012.  The letter noted that defendant

7    Hagenbuch had served on the Compensation Committee, and routinely approved lucrative compensation

8    agreements to his friend, defendant S. Wynn.  These compensation packages were routinely criticized.

9    In fact, excluding shares voted by defendant S. Wynn, only 44% of stockholders voting at the

10    Company's 2017 Annual Meeting voted in favor of the Company's say-on-pay proposal.  In the letter,

11    Elaine Wynn also pointed out that defendant Hagenbuch "is also the chairman of the board's audit

12    committee, which is charged with overseeing the Company's legal and regulatory compliance program

13    and apparently did not detect the alleged conduct at issue.  ***The board has put [defendant] Hagenbuch***

14    ***in a position to investigate his own committee's failures and his friend's conduct.***"

15          97.    Further, on February 9, 2018, just one week after the Board announced it had retained the

16    independent law firm O'Melveny & Myers LLP ("O'Melveny") to assist with the Special Committee's

17    investigation, the Board canceled the investigation and terminated O'Melveny.  The Special Committee

18    formed by the Board to investigate the misconduct allegations stated that the committee "no longer

19    requires the services" of the firm since defendant S. Wynn voluntarily resigned.  Columbia Law School

20    Professor John C. Coffee Jr., an expert on corporate governance, noted that the Board's decision to cut

21    ties with O'Melveny was "a strong signal that not much has changed in the culture of the [B]oard."

22          98.    Then, days after terminating O'Melveny, the Board announced that Gibson, Dunn &

23    Crutcher LLP ("Gibson Dunn"), a firm with long-standing connections to the Company, would "assist"

24    the Special Committee with its investigation. In the Company's press release announcing its retention of

25    Gibson Dunn, the Board dropped any pretense that the firm would assist with an independent

26    investigation, stating only that it would "assist ... [with] an expanded and comprehensive review of

27    Wynn Resorts' internal policies and procedures ...."  Unfortunately, the firm's deep ties to Wynn prevent

28    it from assisting the Board with a truly independent investigation.  Defendant Sinatra is a former partner

of Gibson Dunn and the firm recently represented Wynn Board members and certain executives in litigation against ousted Board members Kazuo Okada ("Okada") and Elaine Wynn.  In addition, Gibson Dunn previously represented the Company in SEC and U.S. Department of Justice matters, as well as in a number of business deals.  Accordingly, Gibson Dunn was tasked with investigating the Company and the Board while defending the Company and Board in other Wynn litigation where many of the same directors were accused of breaching their fiduciary duties in connection with their ousting of Okada.

### DESPITE HIS IMPROPRIETIES, THE BOARD GIVES DEFENDANT S. WYNN A HERO'S FAREWELL AND ALLOWS HIM TO VOLUNTARILY RESIGN AND RETAIN HIS WYNN STOCK

99.    On February 6, 2018, facing extreme public pressure and citing an "avalanche of negative publicity," the Company issued a statement announcing that defendant S. Wynn had voluntarily resigned as CEO and Chairman of the Board.  Despite credible accusations of a long-standing pattern of sexual abuse and harassment against defendant S. Wynn, in the announcement, the Board stated that it had accepted defendant S. Wynn's resignation with a "collective heavy heart" and touted defendant S. Wynn as "an industry giant," "a philanthropist and a beloved leader and visionary."  The Board also boasted about defendant S. Wynn's career, stating that he "created modern Las Vegas" and "played the pivotal role in transforming Las Vegas into the entertainment destination it is today."

100.    In addition, the Board allowed defendant S. Wynn to retain his ownership interest in the Company following his resignation, despite its ability to redeem his shares.  The Company's Articles expressly allow the Board to redeem the shares of any officer who threatens the "suitability" of the Company under state gaming laws, and defines an "Unsuitable Person" as one who, "in the sole discretion of the board of directors of the Corporation, is deemed likely to jeopardize the Corporation's or any Affiliated Company's application for, receipt of approval for, right to the use of, or entitlement to, any Gaming License."  Article VII, Section 1(l).  The Articles provide that an Unsuitable Person's Wynn stock is "subject to redemption by the Corporation ... to the extent deemed necessary or advisable by the board of directors."  Article VII, Section 2(a).

101.    Defendant S. Wynn's decades-long sexual harassment and abuse has seriously "jeopardize[d]" the Company's gaming licenses.  In fact, upon learning of defendant S. Wynn's improprieties, multiple gaming authorities initiated investigations into defendant S. Wynn's misconduct

and his suitability.   As such, defendant S. Wynn was an "Unsuitable Person" as defined under the Articles, and the Board should have immediately acted to redeem his shares. Nonetheless, the Board allowed defendant S. Wynn to retain his ownership share in the Company, until he voluntarily entered into stock purchase agreements to completely sell out his position in the Company by March 26, 2018, for $2.1 billion.

102.    The Board's treatment of defendant S. Wynn stands in stark contrast to its treatment of ousted director Okada, whom the Board removed for purported misconduct.   In 2012, the Board determined that Okada was an "Unsuitable Person" under Article VII of the Company's Articles based on a purported independent investigation into Okada's compliance with the Foreign Corrupt Practices Act.   Based on the Board's finding of "unsuitability," on February 18, 2012, the Company forcibly redeemed Okada's roughly twenty-five million shares of Wynn stock at a thirty percent discount.

103.    In litigation commenced in 2012, Okada claimed that defendant S. Wynn created a plan to oust Okada from the Board and to force the Company to redeem his shares pursuant to the unsuitability provisions of the Company's Articles.[6]   The Company, apparently at defendant S. Wynn's behest, initiated a sham investigation into Okada's alleged bribing of Philippine government officials as a pretext to oust Okada and protect his dominance over the Company.   In court filings disputing the validity of the share redemption, an attorney representing a party to the *Okada* suit explained how defendant S. Wynn dominated the Board: "The Wynn board will pull out all the stops to go after, to attack anyone opposed to Mr. Wynn, like Mr. Okada and Ms. Wynn.   But when it comes to Mr. Wynn and his friends, the board does nothing."   Likewise, in a 2013 court filing, Okada's attorneys wrote, "Mr. Wynn consistently refused efforts to consider Aruze USA directors for the board, in an effort to continue to monopolize control over Wynn Resorts."

---

[6] *Wynn Resorts, Ltd. v. Okada, et al.*, No. A-12-656710-B (8th Jud.. Dist., Nev. 2012).

**THE INDIVIDUAL DEFENDANTS MADE OR ALLOWED WYNN TO MAKE IMPROPER STATEMENTS IN BREACH OF THEIR FIDUCIARY DUTIES**

104.   On February 28, 2014, Wynn filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2013 (the "2013 Form 10-K").  The 2013 Form 10-K was signed by defendants S. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Maddox, and certified as accurate pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants S. Wynn and Maddox.  The 2013 Form 10-K advised of the Company's Code of Conduct, stating:

> As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

105.   The Company's Code of Conduct in effect at the time stated that the Company takes seriously and "promptly investigat[es] all reported violations of the Code."   The Code further represented that the Company uses "every reasonable effort to prevent the occurrence of conduct not in compliance with the Code and to halt any such conduct that may occur as soon as reasonably possible after its discovery."  The Code stated:

> All of us at Wynn Resorts are focused on our commitment to providing an elegant environment, high-quality amenities, a superior level of service and distinctive attractions for our customers.  However, our ability to conduct our business and sustain the respect of the investment community and the people who regulate our industry rests first and foremost on our commitment to integrity.
>
> *          *          *
>
> Our business depends on the reputation of all of us for integrity and principled business conduct.  The purpose of this Code of Business Conduct and Ethics (the "Code") is to reinforce and enhance the commitment of Wynn Resorts, Limited (together with its affiliates, the "Company") to an ethical way of doing business. The Code applies to all employees, officers, directors, agents, and representatives of the Company and its affiliates ("Covered Persons" or "you"). This Code also applies to certain independent contractors and consultants who work at the Company's facilities or on the Company's behalf, in which case those persons will be notified and provided a copy of this Code and will be deemed a Covered Person. The policies set forth here are the basis for the

Company to continue a tradition of high ethical business standards. The Company has additional policies that supplement the policies in this Code.

\*          \*          \*

***All reported violations of the Code will be taken seriously and promptly investigated.*** All reports will be treated confidentially to the extent reasonably possible. It is the Company's policy that no one will be subject to retaliation or adverse employment action because of a good faith report of suspected misconduct or for assisting in any investigation of suspected misconduct. It is imperative that reporting persons not conduct their own preliminary investigations. Investigations of alleged violations may involve complex legal issues, and acting on your own may compromise the integrity of an investigation and adversely affect both you and the Company....

***The Company intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with the Code and to halt any such conduct that may occur as soon as reasonably possible after its discovery.*** Subject to applicable law and agreements, Covered Persons who violate this Code and other Company policies and procedures may be subject to disciplinary action, up to and including discharge.

106.    On May 9, 2014, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the first quarter ended March 31, 2014 (the "Q1 2014 Form 10-Q").  The Q1 2014 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Maddox, stating that the information contained in the Q1 2014 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

107.    On August 8, 2014, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the second quarter ended June 30, 2014 (the "Q2 2014 Form 10-Q").  The Q2 2014 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q2 2014 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

108.    On November 7, 2014, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the third quarter ended September 30, 2014 (the "Q3 2014 Form 10-Q").  The Q3 2014 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q3 2014 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash

flows of the registrant as of, and for, the periods presented in [the] report."

109.   On March 2, 2015, Wynn filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2014 (the "2014 Form 10-K").  The 2014 Form 10-K was signed by defendants S. Wynn, Hagenbuch, Irani, Miller, Shoemaker, Virtue, Wayson, and Cootey, and contained SOX certifications by defendants S. Wynn and Cootey.  The 2014 Form 10-K advised of the Company's Code of Conduct, stating:

> As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors.  In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

110.   The Code of Conduct in effect at the time contained the same representations described in ¶105 above.

111.   On May 8, 2015, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the first quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q").  The Q1 2015 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q1 2015 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

112.   On August 7, 2015, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the second quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q").  The Q2 2015 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q2 2015 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

113.   On November 6, 2015, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the third quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q").  The Q3 2015 Form 10-Q contained signed certifications pursuant to

SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q3 2015 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

114.    On February 29, 2016, Wynn filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K").  The 2015 Form 10-K was signed by defendants S. Wynn, Hagenbuch, Irani, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey, and contained SOX certifications by defendants S. Wynn and Cootey.  The 2015 Form 10-K advised of the Company's Code of Conduct, stating:

> As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors. In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

115.    The Code of Conduct in effect at the time contained the same representations described in ¶105 above.

116.    On May 6, 2016, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the first quarter ended March 31, 2016 (the "Q1 2016 Form 10-Q").  The Q1 2016 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q1 2016 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

117.    On August 9, 2016, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the second quarter ended June 30, 2016 (the "Q2 2016 Form 10-Q").  The Q2 2016 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q2 2016 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

118.    On November 4, 2016, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the third quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q").  The Q3 2016 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Cootey, stating that the information contained in the Q3 2016 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

119.    On February 24, 2017, Wynn filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2016 (the "2016 Form 10-K").  The 2016 Form 10-K was signed by defendants S. Wynn, Hagenbuch, Irani, Johnson, Miller, Mulroy, Randt, Shoemaker, Virtue, Wayson, and Cootey, and contained SOX certifications by defendants S. Wynn and Cootey.  The 2016 Form 10-K advised of the Company's Code of Conduct, stating:

> As part of the Company's commitment to integrity, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all directors, officers and employees of the Company and its subsidiaries. This Code is periodically reviewed by the Board of Directors.  In the event we determine to amend or waive certain provisions of this code of ethics, we intend to disclose such amendments or waivers on our website at http://www.wynnresorts.com under the heading "Corporate Governance" within four business days following such amendment or waiver or as otherwise required by the NASDAQ listing standards.

120.    The Code of Conduct in effect at the time contained the same representations described in ¶105 above.

121.    On May 4, 2017, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the first quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q").  The Q1 2017 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Billings, stating that the information contained in the Q1 2017 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

122.    On August 4, 2017, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the second quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q").  The Q2 2017 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Billings, stating that the information contained in the Q2 2017 Form 10-Q

"fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

123.    On November 8, 2017, Wynn filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q").  The Q3 2017 Form 10-Q contained signed certifications pursuant to SOX by defendants S. Wynn and Billings, stating that the information contained in the Q3 2017 Form 10-Q "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the] report."

### REASONS THE STATEMENTS WERE IMPROPER

124.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that defendant S. Wynn had engaged in a pattern of sexual misconduct with respect to Wynn employees;

(b)    when defendant S. Wynn's misconduct would inevitably be revealed, the Company would be subject to heightened regulatory scrutiny, its brand would be negatively impacted, and its gambling licenses would be put in jeopardy; and

(c)    as a result of the foregoing, the Company's representations concerning its operations, corporate governance, and compliance policies were improper.

### THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN WYNN'S PROXY STATEMENTS

**The 2016 Proxy Statement**

125.    On March 4, 2016, Wynn issued its Proxy Statement for the 2016 Annual Meeting of Stockholders, held on April 14, 2016 (the "2016 Proxy"). In the 2016 Proxy, defendants Irani, Shoemaker, S. Wynn, Miller, Randt, Wayson, Hagenbuch, Mulroy, and Virtue solicited stockholder votes to, among other things, reelect defendants Irani, Shoemaker, and S. Wynn to the Board. Defendants Irani, Shoemaker, S. Wynn, Miller, Randt, Wayson, Hagenbuch, Mulroy, and Virtue negligently issued misleading statements with respect to each of these solicited votes.

126.     In support of defendants Irani, Shoemaker, S. Wynn, Miller, Randt, Wayson, Hagenbuch, Mulroy, and Virtue's bid to reelect defendants Irani, Shoemaker, and S. Wynn, these defendants highlighted their supposed successful oversight of the Company.   In particular, the 2016 Proxy assured stockholders that the Board and its Committees periodically assess the significant risks that Wynn faces, including legal risks, and regularly reviews information regarding specific areas of risk, including regulatory compliance.   The 2016 Proxy stated:

> **Our Governance Program**. Our Board and management are committed to sound and effective corporate governance. Consistent with this commitment, ***the Company has established a comprehensive corporate governance framework***, with policies and programs designed not only to satisfy the extensive regulatory requirements applicable to our business but also ***to build value for the Company's stockholders and promote the vitality of the Company for*** its customers, employees and the other individuals and organizations that depend upon it.

*     *     *

> **Corporate Social Responsibility**. In addition, ***we are committed to operating our business in a manner that incorporates our core values of compassion and responsibility***, including participating in wide-ranging community service and philanthropic efforts that assist underserved communities in the markets in which we operate.

*     *     *

> **Chairman and CEO**. ***Mr. Wynn currently serves as the Chairman and CEO of the Company***. Mr. Wynn has served in these roles since the Company's inception in 2002. We believe that during his tenure, ***Mr. Wynn has delivered exceptional value to our stockholders***.

*     *     *

> **Other Board Governance Measures**. The combined role of Chairman and CEO is further balanced by ***the Board's demonstrated commitment and ability to provide independent oversight of management***. Seven of the nine members of our Board satisfy the most stringent requirements of independence under the Exchange Act and NASDAQ for audit committee members, and the Audit, Compensation, and Corporate Governance Committees are each comprised entirely of independent members of the Board. We believe this structure encourages independent and effective oversight of the Company's operations and prudent management of risk. In addition, the Company is subject to stringent regulatory requirements and oversight, combining our internal controls with third-party monitoring of the Company's operations. The independent members of the Company's Board meet separately in executive session at each regular meeting of the Board. The members of the Audit Committee also meet separately in executive session with each of the Company's independent auditors, the Vice President of Internal Audit,

the Chief Financial Officer, the General Counsel and the Compliance Officer. The Lead Independent Director is responsible for communicating to the CEO and management all concerns that arise during executive sessions. In addition, all Committee agendas and all agendas for meetings of the Board are provided in advance to all independent members of the Board. The independent directors are encouraged to, and do, review the proposed agenda items and add additional items of concern or interest.

*     *     *

**Risk Oversight**

The Board has an active role in overseeing the Company's areas of risk. The Board and its Committees regularly review information regarding the Company's risk profile and have, in consultation with management and the Company's independent auditors, identified specific areas of risk including: regulatory compliance, legislative and political conditions, capital availability and liquidity, gaming credit extension and collection, construction, catastrophic events and succession planning. The Board (as a whole and through its Committees) has reviewed and approved management's process for identifying, managing and mitigating these risks. While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk oversight to its Committees as well as to the Company's Compliance Committee. ***Throughout the year, the Board, its Committees and the Company's Compliance Committee receive reports from management that include information regarding major risks and exposures facing the Company and the steps management has taken to monitor and control such risks and exposures***. In addition, throughout the year, the Board, its Committees and the Company's Compliance Committee dedicate a portion of their meetings to review and discuss specific risk topics in greater detail. The Audit Committee is primarily responsible for the oversight of credit, related party, construction and general financial risks. The Company's Compliance Committee primarily oversees risks relating to regulatory, security and political compliance. For the 2015 fiscal year, management completed a review of the Company's compensation policies and practices and presented its analysis to the Compensation Committee. The Compensation Committee concurred with management's conclusion that such policies and practices do not present risks that are reasonably likely to have a material adverse effect on the Company.

127.    The 2016 Proxy thus assured stockholders that the Board was involved with Wynn's business strategy and actively monitored the Company's risks and exposure.  In reality, the Board was utterly failing in its oversight duties; allowing the Company to operate with inadequate internal controls, all while being informed of developing liability resulting from the Company's failure to remedy defendant S. Wynn's long-standing inappropriate behavior.

128.    The 2016 Proxy harmed Wynn by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.  As a result of the misleading statements in the 2016 Proxy, Wynn's stockholders voted via an uninformed stockholder

vote to reelect defendants Irani, Shoemaker, and S. Wynn to Wynn's Board.

129.   Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**The 2017 Proxy Statement**

130.   On March 10, 2017, Wynn issued its Proxy Statement for the 2017 Annual Meeting of Stockholders, held on April 21, 2017 (the "2017 Proxy").   In the 2017 Proxy, defendants Irani, Shoemaker, S. Wynn, Miller, Randt, Wayson, Hagenbuch, Johnson, Mulroy, and Virtue solicited stockholder votes to, among other things, reelect defendants Miller, Randt, and Wayson to the Board. Defendants Irani, Shoemaker, S. Wynn, Miller, Randt, Wayson, Hagenbuch, Johnson, Mulroy, and Virtue negligently issued misleading statements with respect to each of these solicited votes.

131.   In support of defendants Irani, Shoemaker, S. Wynn, Miller, Randt, Wayson, Hagenbuch, Johnson, Mulroy, and Virtue's bid to reelect defendants Miller, Randt, and Wayson, these defendants highlighted their supposed successful oversight of the Company.  In particular, the 2017 Proxy assured stockholders that the Board and its Committees periodically assess the significant risks that Wynn faces, including legal risks, and regularly reviews information regarding specific areas of risk, including regulatory compliance.  The 2017 Proxy stated:

> **Our Governance Program**.  Our Board and management are committed to sound and effective corporate governance.  Consistent with this commitment, ***the Company has established a comprehensive corporate governance framework***, with policies and programs designed not only to satisfy the extensive regulatory requirements applicable to our business but also ***to build value for the Company's stockholders and promote the vitality of the Company for*** its customers, employees and the other individuals and organizations that depend upon it.
>
> *          *          *
>
> **Corporate Social Responsibility**.  ***We are committed to operating our business in a manner that incorporates our core values of compassion and responsibility***, including participating in wide-ranging community service and philanthropic efforts that assist underserved communities in the markets in which we operate.

\*   \*   \*

**Chairman and CEO**.  Mr. Wynn has served as the Chairman and CEO of the Company since its formation in 2002….

[T]he Board believes that Mr. Wynn's combined role as Chairman and CEO *promotes unified leadership and direction for the Board and management*, and provides focused leadership for the Company's operational and strategic efforts.

\*   \*   \*

**Other Board Governance Measures**.  The combined role of Chairman and CEO is further balanced by *the Board's demonstrated commitment and ability to provide independent oversight of management*.  As discussed in greater detail below, eight of the ten members of our Board satisfy the most stringent requirements of independence under the Exchange Act and NASDAQ for audit committee members, and the Audit, Compensation, and Corporate Governance Committees are each comprised entirely of independent members of the Board.  *We believe this structure encourages independent and effective oversight of the Company's operations and prudent management of risk*. In addition, the Company is subject to stringent regulatory requirements and oversight, combining our internal controls with third-party monitoring of the Company's operations. The independent members of the Board meet separately in executive session at each regular meeting of the Board. The members of the Audit Committee also meet separately in executive session with each of the Company's independent auditors, General Counsel, Chief Audit Executive, Chief Financial Officer and Compliance Officer. The Lead Independent Director is responsible for communicating to the CEO and management all concerns that arise during executive sessions. In addition, all Committee agendas and all agendas for meetings of the Board are provided in advance to all independent members of the Board. The independent directors are encouraged to, and do, review the proposed agenda items and add additional items of concern or interest.

\*   \*   \*

**Risk Oversight**

*The Board has an active role in overseeing the Company's areas of risk. The Board and its Committees regularly review information regarding the Company's risk profile* and have, in consultation with management and the Company's independent auditors, identified specific areas of risk including: regulatory compliance; legal, legislative and political conditions; capital availability and liquidity; gaming credit extension and collection; construction; catastrophic events; and succession planning. The Board (as a whole and through its Committees) has reviewed and approved management's process for identifying, managing and mitigating these risks.  While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk oversight to its Committees as well as to the Company's Compliance Committee.  *Throughout the year, the Board, its Committees and the Company's Compliance Committee receive reports from management that include information regarding major risks and exposures facing the Company and the steps management has taken to monitor and control such risks and exposures*.  In addition, throughout the year, the Board, its

Committees and the Company's Compliance Committee dedicate a portion of their meetings to review and discuss specific risk topics in greater detail.   The Audit Committee is primarily responsible for the oversight of credit, related party, construction and general financial risks. The Company's Compliance Committee primarily oversees risks relating to regulatory, security and political compliance.

132.    The 2017 Proxy thus assured stockholders that the Board was involved with Wynn's business strategy and actively monitored the Company's risks.  In reality, the Board was utterly failing in its oversight duties; allowing the Company to operate with inadequate internal controls, all while being informed of developing liability resulting from the Company's failure to remedy defendant S. Wynn's long-standing inappropriate behavior.

133.    The 2017 Proxy harmed Wynn by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.  As a result of the misleading statements in the 2017 Proxy, Wynn's stockholders voted via an uninformed stockholder vote to reelect defendants Miller, Randt, and Wayson to Wynn's Board.

134.    Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**THE TRUTH EMERGES**

135.    The truth behind the Individual Defendants' wrongdoing began to emerge on January 26, 2018, when the *WSJ* published an article titled "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn," reporting on the decades-long pattern of sexual misconduct by defendant S. Wynn.  The *WSJ* article, based on interviews with more than 150 persons, stated:

Not long after the billionaire casino mogul Steve Wynn opened his flagship Wynn Las Vegas in 2005, a manicurist who worked there arrived at the on-site salon visibly distressed following an appointment in Mr. Wynn's office.

Sobbing, she told a colleague Mr. Wynn had forced her to have sex, and she repeated that to others later.

After she gave Mr. Wynn a manicure, she said, he pressured her to take her clothes off and told her to lie on the massage table he kept in his office suite, according to people she gave the account to.  The manicurist said she told Mr. Wynn she didn't want to have sex

and was married, but he persisted in his demands that she do so, and ultimately she did disrobe and they had sex, the people remember he saying.

After being told of the allegations, the woman's supervisor said she filed a detailed report to the casino's human-resources department recounting the episode.

Mr. Wynn later paid the manicurist a $7.5 million settlement, according to people familiar with the matter.

The incident was referenced, in broad terms, in a lawsuit in which Mr. Wynn's ex-wife, Elaine Wynn, seeks to lift restrictions on the sale of her stock in Wynn Resorts Ltd. Attorneys for Mr. Wynn in a court filing admitted he made the personal payment; in a later hearing, his corporate attorney said there had been "allegations of assault." Court records in the suit are heavily redacted. Specifics of the allegation and the size of the settlement haven't been previously reported.

Beyond this incident, dozens of people The Wall Street Journal interviewed who have worked at Mr. Wynn's casinos told of behavior that cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn.   Some described him pressuring employees to perform sex acts.

136.    The *WSJ* article went on to describe assaults against other female Wynn employees, including unwanted sexual advances and a sexual assault against a masseuse, stating:

Mr. Wynn is a regular on his casino floors, known for a keen attention to details and what employees say is a temper that can flare when they fall short. He has frequently had services such as manicures, massages and makeup application performed in his on-site office at the Wynn Las Vegas.

The contrast between Mr. Wynn's position and that of the salon and spa employees is stark.   Former employees said their awareness of Mr. Wynn's power in Las Vegas, combined with the knowledge that the jobs they held were among the best-paying available there, added up to a feeling of dependence and intimidation when Mr. Wynn made requests of them.

Some said that feeling was heightened at times by the presence in a confined office space of one or more of his German shepherds, trained to respond to commands in German.

The Journal contacted more than 150 people who work or had worked for Mr. Wynn; none reached out to the Journal on their own. Most of those who spoke to the Journal about Mr. Wynn said they worried that doing so could hurt their ability to work elsewhere because of his influence in the casino industry and the state.

Former employees said they sometimes entered fake appointments in the books to help other female workers get around a request for services in Mr. Wynn's office or arranged for others to pose as assistants so they wouldn't be alone with him. They told of female employees hiding in the bathroom or back rooms when they learned he was on the way to the salon.

"Everybody was petrified," said Jorgen Nielsen, a former artistic director at the salon. **Mr. Nielsen said he and others repeatedly told high-level company executives Mr. Wynn's sexual advances were causing a problem, but "nobody was there to help us."**

One former massage therapist at the Wynn Las Vegas spa said that several years ago, when Mr. Wynn was booking multiple appointments a week with her in the private massage room in his office suite, he would continually adjust a towel to expose himself. Then at one session, she said, he threw it off and said, "Just get this thing off of me."

She said he wouldn't let her use a towel to cover his genitals after that, contrary to state licensing regulations, and he also began rubbing her leg while she massaged him.

After a few weeks, the former employee said, Mr. Wynn instructed her to massage his penis to climax. The woman said that because he was her boss, she felt she had no choice but to agree to some of Mr. Wynn's requests, including that one. She said masturbating him became a frequent part of the massage sessions for several months.

At the end of each hour-long massage session, she said, he handed her $1,000 in cash, which was the same amount as before the sexual activity began.

In subsequent sessions, the woman said, Mr. Wynn asked her to perform oral sex on him and described in detail how he wanted it done. This request she refused, she said.

The woman said she told Mr. Wynn at a later session she was uncomfortable with his requests, and he then stopped asking for massages from her.

She said she didn't tell anyone what happened at the time because she was embarrassed, adding she is still trying to deal with the incident emotionally. She did tell a colleague in a general way that Mr. Wynn had been inappropriate with her, that colleague recalled in an interview.

The colleague said she offered advice to the massage therapist – but didn't mention that Mr. Wynn had also made advances toward her while she massaged him in his office's private massage room. The colleague said in an interview Mr. Wynn would remove his towel and, while she massaged the front of his thighs, would tell her to "go higher," which she understood to mean touch his genitals. She said she told him this made her uncomfortable, and then his requests for massages became less frequent.

137.    In addition to defendant S. Wynn's assault of masseuses, the *WSJ* article explained that defendant S. Wynn created a hostile working environment where female employees were constantly uncomfortable.  For example, in the *WSJ* article, a number of former Wynn Las Vegas employees recalled defendant S. Wynn walking around areas of the resort in short shorts without underwear. Former employees also recalled that defendant S. Wynn would get pedicures at the Salon and sit in a way as to expose his genitals.  In particular, the *WSJ* article states:

Shawn Cardinal, who was a personal assistant to Elaine Wynn while she was married to Mr. Wynn, said that around 1987, Mr. Wynn repeatedly asked her to spend time with him outside of work. She said he continued asking, often approaching her at her desk outside his wife's office, despite her telling him she had plans with her husband and child.

On the phone, he would ask, "What are you wearing? Why don't you hang out with me after work?" said Ms. Cardinal. "I was not brave enough to say, 'How dare you?' I just joked my way out of it and I made sure I was never alone with him."

Several former employees said Mr. Wynn often walked around some areas of the complex in extremely short shorts without underwear, and he would sit in the salon to get pedicures in such a way that his genitals were exposed.

One former employee said after she had performed services in Mr. Wynn's office for years, one day he asked if he could kiss her. She said she laughed off the request, hoping to leave without upsetting him.

Another time, this employee said, she was performing services in her own workplace at the casino when Mr. Wynn said, "So when are you going to come into my office and f— me?"

She said that she again laughed off the proposition. "I would say, 'Oh Mr. Wynn[,]'" she recalled.  "I was just trying to get on with my job."

One time as she did her work in Mr. Wynn's office, this woman said, he repeatedly rubbed his genitals, which were falling out of his shorts, and made comments about things he would like to do with her sexually.  On one occasion as she was leaving his office, the former employee said, Mr. Wynn grabbed her waist as she stood against a wall and told her to kiss him.  She said she slipped out of his hold and left.

After around two weeks of pursuit, this woman said, Mr. Wynn stopped.

The former employee's supervisor and another colleague confirmed being told of these advances in detail at the time.  The employee and the supervisor said they sought to manage the situation rather than report it because they believed there would be repercussions if they did.

The 2005 allegations of the manicurist that led to the settlement were the most striking described by former employees.  In this instance, a woman who was a salon manager at the time said she filed a written report to human resources. She said she got a call from an executive, Doreen Whennen, castigating her for filing to HR and saying she should have taken the matter directly to Ms. Whennen.

The former manager said no one followed up with her about the matter. The manicurist soon left.

138.   When defendant S. Wynn's improprieties were publicly revealed, Wynn's stock plummeted 18.5%, or $37.12 per share, from $200.60 per share on January 25, 2018, to close at $163.48

per share on January 29, 2018, erasing more than $3.8 billion in market capitalization in two trading days.

139.    Making matters worse, following these shocking revelations, the Massachusetts Gaming Commission and Nevada Gaming Control Board both opened investigations into the Company over the sexual misconduct allegations reported in the *WSJ* article.   With respect to its investigation, the Massachusetts Gaming Commission stated: "The suitability and integrity of our gaming licensees is of the utmost importance, and ensuring that suitability is an active and ongoing process.  Consequently, the [Commission's] Investigations and Enforcement Bureau will conduct a regulatory review of this matter to determine the appropriate next steps."   The head of the Massachusetts Gaming Commission's Investigations and Enforcement Bureau explained that the Commission's Bureau was particularly focused on the $7.5 million settlement defendant S. Wynn paid in 2005 to the victim of an alleged sexual assault, stating: "The circumstances around this $7.5 million settlement and the decision not to disclose it to investigators, remain a critical element of this review."

140.    On February 13, 2018, after the market closed, media outlets reported that two women had filed new sexual misconduct reports with the Las Vegas Metropolitan Police Department, alleging that defendant S. Wynn had sexually assaulted them in the 1970s.  According to a statement issued by the Las Vegas Metropolitan Police Department, one of the women reported that defendant S. Wynn assaulted her in Las Vegas and the other reported that defendant S. Wynn assaulted her in Chicago.

141.    On March 19, 2018, the *WSJ* further reported that defendant S. Wynn had paid a settlement to a second Wynn employee in 2006, concerning sexual misconduct allegations.  According to the *WSJ* article, when the employee informed defendant S. Wynn that she wanted to publicly disclose the details of the event following the January 26, 2018 *WSJ* article, defendant S. Wynn's attorneys contacted the Federal Bureau of Investigation requesting that the agency investigate her for extortion. The former employee only sought to reveal information underlying her settlement; no money was ever demanded and the Bureau closed the investigation two weeks later.

142.    On January 25, 2019, the Nevada Gaming Control Board filed the NGCB Complaint alleging that the Company's fiduciaries' failure to enforce Wynn's policies and procedures allowed defendant S. Wynn's rampant sexual harassment to go uninvestigated, and thus continue unimpeded, for

a number of years.  The NGCB Complaint, based on an extensive and thorough investigation of the Company and defendant S. Wynn, corroborated the allegations contained in the previously published media articles and confirmed the extent to which the Company's high-level executives were made aware of defendant S. Wynn's inappropriate conduct but failed to investigate.  The regulators also uncovered previously undisclosed instances of defendant S. Wynn's sexual improprieties.  Among the Nevada Gaming Control Board's allegations not previously detailed by the media was that a former cocktail waitress and flight attendant had in 2014 accused defendant S. Wynn of sexual misconduct that she said took place nearly a decade earlier.  Another allegation laid out by the NGCB Complaint involved an employee who allegedly facilitated sexual relationships between cocktail servers and defendant S. Wynn or his guests.

### INSIDER SALES BY DEFENDANTS HAGENBUCH, MADDOX, MULROY, RANDT, SHOEMAKER, SINATRA, AND WAYSON

143.    Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Wynn's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Wynn, defendants Hagenbuch, Maddox, Mulroy, Randt, Shoemaker, Sinatra, and Wayson were privy to material, nonpublic information about the Company's true business health.

144.    While in possession of this knowledge, defendant Maddox sold 223,157 shares of his personally held Wynn stock for proceeds of over $32 million.  Defendant Maddox's sales were timed to maximize profit from Wynn's then artificially inflated stock price.  In fact, significant portions of these sales—59,260 shares—occurred in November 2017, well after the "#MeToo" movement began, and likely after the *WSJ* began its investigation into sexual harassment allegations against defendant S. Wynn.  At the time of these sales, defendant Maddox was aware of the 2005 assault and that defendant S. Wynn's rampant pattern of sexual harassment put the Company's gaming licenses in jeopardy.  Defendant Maddox's sales are also suspicious given that his stock sales represented 37% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 73,560 |
| Shares Sold During Sales Period ("SP") | 223,157 |
| Shares Disposed (Other) During SP | 46,434 |

| | |
|---|---|
| Total Shares Held During SP | 598,017 |
| Shares Remaining SP | 328,426 |
| **Total Proceeds from Sales** | **$32,162,052.57** |
| **% of Total Ownership Sold During SP** | **37.32%** |

145.     While in possession of this knowledge, defendant Sinatra sold 121,135 shares of her personally held Wynn stock for proceeds of over $16 million.  Defendant Sinatra's sales were timed to maximize profit from Wynn's then artificially inflated stock price.  In fact, significant portions of these sales—20,810 shares—occurred in November 2017, well after the "#MeToo" movement began, and likely after the *WSJ* began its investigation into sexual harassment allegations against defendant S. Wynn.  At the time of these sales, defendant Sinatra was aware of the 2005 assault and that defendant S. Wynn's serial sexual harassment put the Company's gaming licenses in jeopardy.  Defendant Sinatra's sales are also suspicious given that her stock sales represented nearly 34% of her holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 65,287 |
| Shares Sold During SP | 121,135 |
| Shares Disposed (Other) During SP | 26,777 |
| Total Shares Held During SP | 358,246 |
| Shares Remaining SP | 210,334 |
| **Total Proceeds from Sales** | **$16,154,085.26** |
| **% of Total Ownership Sold During SP** | **33.81%** |

146.     While in possession of this knowledge, defendant Shoemaker sold 25,000 shares of his personally held Wynn stock for proceeds of over $3.8 million.  Defendant Shoemaker's sales were timed to maximize profit from Wynn's then artificially inflated stock price.  In fact, significant portions of these sales—15,000 shares—occurred in November 2017, well after the "#MeToo" movement began, and likely after the *WSJ* began its investigation into sexual harassment allegations against defendant S. Wynn.  At the time of these sales, defendant Shoemaker was aware of the 2005 assault and that defendant S. Wynn's serial sexual harassment put the Company's gaming licenses in jeopardy. Defendant Shoemaker's sales are also suspicious given that his stock sales represented 73% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 2,500 |
| Shares Sold During SP | 25,000 |
| Shares Disposed (Other) During SP | 0 |

| Total Shares Held During SP | 34,162 |
|---|---|
| Shares Remaining SP | 9,162 |
| **Total Proceeds from Sales** | **$3,866,100.00** |
| **% of Total Ownership Sold During SP** | **73.18%** |

Defendant Shoemaker's sales were dramatically out of line with his prior trading practices. Indeed, prior to November 8, 2017, defendant Shoemaker had not sold a single share of Wynn stock in over two years.

147.    While in possession of this knowledge, defendant Wayson sold 37,500 shares of his personally held Wynn stock for proceeds of over $3 million. Defendant Wayson's sales were timed to maximize profit from Wynn's then artificially inflated stock price. At the time of these sales, defendant Wayson was aware of the 2005 assault and that defendant S. Wynn's serial sexual harassment put the Company's gaming licenses in jeopardy. Defendant Wayson's sales are suspicious given his that stock sales represented 28% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 6,300 |
|---|---|
| Shares Sold During SP | 37,500 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 131,662 |
| Shares Remaining SP | 94,162 |
| **Total Proceeds from Sales** | **$3,267,000.00** |
| **% of Total Ownership Sold During SP** | **28.48%** |

These sales were dramatically out of line with his prior trading practices. Indeed, while defendant Wayson sold a substantial portion of his holdings when the Company's stock was artificially inflated, he made no sales of Wynn stock in the previous five years.

148.    While in possession of this knowledge, defendant Randt sold 3,000 shares of his personally held Wynn stock for proceeds of $387,000. Defendant Randt's sales were timed to maximize profit from Wynn's then artificially inflated stock price. Defendant Randt's sales are suspicious given that his stock sales represented nearly 39% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 0 |
|---|---|
| Shares Sold During SP | 3,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 7,711 |
| Shares Remaining SP | 4,711 |
| **Total Proceeds from Sales** | **$387,000.00** |
| **% of Total Ownership Sold During SP** | **38.91%** |

These sales were dramatically out of line with his prior trading practices.  In fact, prior to defendant Randt's sale of 3,000 shares, he had never sold any shares of Wynn stock.

149.    While in possession of this knowledge, defendant Mulroy sold 2,226 shares of her personally held Wynn stock for proceeds of $285,106.08.  Defendant Mulroy's sales were timed to maximize profit from Wynn's then artificially inflated stock price.  Defendant Mulroy's sales are suspicious given that her stock sales represented nearly 28% of her holdings as demonstrated by the table below:

| | |
|---|---|
| Shares Sold During SP | 2,226 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 8,011 |
| Shares Remaining SP | 5,785 |
| **Total Proceeds from Sales** | **$285,106.08** |
| **% of Total Ownership Sold During SP** | **27.79%** |

These sales were dramatically out of line with her prior trading practices.  In fact, prior to defendant Mulroy's sale of 2,226 shares, she had never sold any shares of Wynn stock.

150.    While in possession of this knowledge, defendant Hagenbuch sold 1,150 shares of his personally held Wynn stock for proceeds of $147,661.50.  Defendant Hagenbuch's sales were timed to maximize profit from Wynn's then artificially inflated stock price.  These sales were dramatically out of line with his prior trading practices.  In fact, prior to defendant Hagenbuch's sale of 1,150 shares, he had never sold any shares of Wynn stock.

151.    The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Wynn's stock price.  Following the misleading statements made between September 2015 and November 2017, Wynn's stock price rose from a low of approximately $58 per share to as high as $180.29 per share in January 2018, before the truth emerged, representing a 210% increase.  Notably, while the Company's stock was artificially inflated as a result of the Individual Defendants' misrepresentations, the Insider Selling Defendants sold over $56 million worth of their personally held stock.  Furthermore, none of these sales were made pursuant to a prearranged 10b5-1 trading plan.

152.    In sum, defendants Hagenbuch, Maddox, Mulroy, Randt, Shoemaker, Sinatra, and Wayson sold over $56 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **MADDOX** | 5/12/2014 | 12,697 | $204.02 | $2,590,441.94 |
| **Current President, Chief Executive Officer & Director** | 5/12/2014 | 3,991 | $204.88 | $817,676.08 |
| | 1/15/2015 | 4,262 | $147.65 | $629,284.30 |
| | 1/14/2016 | 9,775 | $51.50 | $503,412.50 |
| | 12/5/2016 | 20,975 | $98.37 | $2,063,310.75 |
| | 1/19/2017 | 6,920 | $90.93 | $629,235.60 |
| | 4/27/2017 | 60,000 | $124.25 | $7,455,000.00 |
| | 6/16/2017 | 44,309 | $134.35 | $5,952,914.15 |
| | 9/15/2017 | 40,833 | $143.41 | $5,855,860.53 |
| | 9/15/2017 | 2,067 | $144.03 | $297,710.01 |
| | 11/13/2017 | 58,258 | $155.11 | $9,036,398.38 |
| | 11/13/2017 | 1,002 | $155.74 | $156,051.48 |
| | 12/22/2017 | 4,502 | $167.75 | $755,210.50 |
| | | **223,157** | **Total (Sales)** | **$32,162,052.57** |
| **SINATRA** | 5/5/2014 | 2,473 | $216.65 | $535,775.45 |
| **Former Executive Vice President and General Counsel** | 5/9/2014 | 13,807 | $198.74 | $2,744,003.18 |
| | 5/9/2014 | 100 | $199.20 | $19,920.00 |
| | 1/15/2014 | 2,262 | $147.65 | $333,984.30 |
| | 1/14/2016 | 4,632 | $51.50 | $238,548.00 |
| | 11/29/2016 | 41,743 | $99.76 | $4,164,281.68 |
| | 11/29/2016 | 600 | $100.22 | $60,132.00 |
| | 12/5/2016 | 10,488 | $98.37 | $1,031,704.56 |
| | 1/19/2017 | 3,921 | $90.93 | $356,536.53 |
| | 6/9/2017 | 22,624 | $129.12 | $2,921,210.88 |
| | 9/15/2017 | 21,451 | $143.62 | $3,080,792.62 |
| | 11/8/2017 | 20,795 | $152.03 | $3,161,463.85 |
| | 11/9/2017 | 15 | $152.07 | $2,281.05 |
| | 12/22/2017 | 3,001 | $167.75 | $503,417.75 |
| | | **121,135** | **Total (Sales)** | **$16,154,085.26** |
| **SHOEMAKER** | 2/13/2015 | 10,000 | $159.00 | $1,590,000.00 |
| **Former Director** | 11/8/2017 | 15,000 | $151.74 | $2,276,100.00 |
| | | **25,000** | **Total (Sales)** | **$3,866,100.00** |
| **WAYSON** | 11/9/2016 | 37,500 | $87.12 | $3,267,000.00 |
| **Fomer Chairman of the Board and Director** | | | | |
| | | **37,500** | **Total (Sales)** | **$3,267,000.00** |
| **RANDT** | 7/31/2017 | 3,000 | $129.00 | $387,000.00 |
| **Current Director** | | | | |
| | | **3,000** | **Total (Sales)** | **$387,000.00** |
| **MULROY** | 5/16/2017 | 2,226 | $128.08 | $285,106.08 |
| **Current Director** | | | | |
| | | **2,226** | **Total (Sales)** | **$285,106.08** |
| **HAGENBUCH** | 5/16/2017 | 1,100 | $128.50 | $141,350.00 |
| **Former Director** | 5/17/2017 | 50 | $126.23 | $6,311.50 |
| | | **1,150** | **Total (Sales)** | **$147,661.50** |

| | | | | |
|---|---|---|---|---|
| | | 413,168 | Total (Sales) | $56,269,005.41 |

## DAMAGES TO WYNN

153.   As a result of the Individual Defendants' improprieties, Wynn engaged in a systemic unlawful pattern and practice of sexual harassment.  Wynn's conduct violated applicable federal and state laws and regulations, exposed the Company to massive liability arising from lawsuits and investigations, and operated to the detriment of the Company and its stockholders.  State and federal governmental enforcement agencies have the authority to impose severe monetary penalties and other forms of sanctions should they find that Wynn's conduct violated the laws with respect to which they have enforcement powers.

154.   In addition, regulations promulgated by the Equal Employment Opportunity Commission make clear that a company is liable for acts of sexual harassment by its employees when it knows, or should have known, about the misconduct, unless the company shows that it took immediate and appropriate corrective action.  Associated enforcement guidance and judicial rulings confirm that companies must undertake a thorough investigation and impose appropriate remedial measures when they learn of sexual harassment allegations.  Otherwise, they are liable for failing to remedy known hostile or offensive work environments.

155.   The misconduct detailed herein has also put the Company's gaming licenses in jeopardy. In fact, after defendant S. Wynn's improprieties were revealed, the Nevada Gaming Control Board and the Massachusetts Gaming Commission both opened investigations into the Company.  Fallout from these investigations has already been severe.  On February 26, 2019, the Nevada Gaming Commission levied a $20 million fine against the Company after finding that Wynn executives repeatedly ignored sexual misconduct claims against defendant S. Wynn in violation of the Nevada Revised Statutes and the Regulations of the Commission.  This record fine is almost four times larger than any previous fine imposed by Nevada's gambling regulators.  Further, the Massachusetts Gaming Commission is now conducting a suitability review of current and former Wynn fiduciaries, including defendants S. Wynn, Maddox, and Sinatra, as well as each of the Director Defendants.  An adverse finding by the Massachusetts Gaming Commission could put an end to Wynn's planned $2.4 billion casino currently

under construction outside of Boston.  Finally, defendant S. Wynn's decades-long misconduct has also subjected Wynn Macau Ltd. to an investigation by Macau regulators.  If an extension of Wynn's concession to operate in Macau is not obtained upon its expiration in 2022, revenues from Wynn's Macau gaming operations will end.

156.    Further, Wynn's business, goodwill, and reputation have been, and will continue to be, severely damaged by the Individual Defendants' decision to allow and/or failure to prevent the Company's systemic violation of state and federal laws.  The Company has long acknowledged that the "loss of Stephen A. Wynn could significantly harm [its] business" and that Wynn's "ability to maintain [its] competitive position is dependent to a large degree on the efforts, skills and reputation of Stephen A. Wynn."  With defendant S. Wynn's resignation, the Company will no longer enjoy what analysts called the "Wynn premium," due to its association with defendant S. Wynn.  One marketing firm remarked that the "Wynn brand is going to take a hit, there's no question about it," and analysts, noting Wynn's value to the Company as "its chief visionary and diplomat" similarly opined that "[w]e do not believe the company can grow at the same trajectory nor can it maintain its cutting edge position."

157.    The Company's failure to remedy defendant S. Wynn's sexual harassment and abuse has exposed the Company to significant reputational damage among consumers and the business community.  Consumers and businesses value companies that respect their employees and live up to the ethical standards they espouse.  Potential customers and business partners are less likely to choose to voluntarily associate with Wynn services and products knowing Wynn was responsible for permitting sexual harassment and abuse of its employees.  Accordingly, the Company stands to lose business and consumer opportunities as a result of the actions of Wynn fiduciaries.

158.    Wynn's ability to attract investors is also impaired.  In addition to price, Wynn's current and potential investors consider a company's trustworthiness, stability, and commitment to corporate responsibility.  Investors are less likely to invest in companies that fail to comply with their own internal protocols and external regulations, and condone or allow rampant sexual harassment.  This is especially true in the current "#MeToo" era.  In fact, after news outlets revealed defendant S. Wynn's serial sexual harassment against Wynn employees, the Company's stock price fell 18.5% in only two trading days, erasing over $3.8 billion of the Company's market capitalization.  Furthermore, a January 29, 2018

*Barron's* article noted, "sexual harassment is becoming a serious investment risk and Wynn Resorts' stock is just the latest example."  Finally, Wynn's ability to raise equity capital or debt on favorable terms in the future is also now impaired.  The Company stands to incur higher marginal costs of capital and debt, because the improprieties detailed herein have materially increased the perceived risks of investing in and lending money to the Company.

159.   As a direct and proximate result of the Individual Defendants' actions, Wynn has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the Securities Class Action;

(b)     costs incurred in defending, settling, or paying any potential adverse judgment in any legal action pertaining to defendant S. Wynn's sexual harassment of female Company employees;

(c)     costs incurred in complying with regulatory investigations, including investigations by gaming regulators in Nevada, Massachusetts, and Macau, as well as any fines, penalties, or gaming license revocation resulting from these investigations, including, without limitation, the $20 million fine imposed by the Nevada Gaming Commission;

(d)     costs incurred in connection with defendant S. Wynn's severance, including $25 million in connection with a consent solicitation to certain debtholders for an agreement to modify the "change in control" provision in the event defendant S. Wynn sells his stock;

(e)     costs incurred to investigate wrongdoing;

(f)     costs incurred in implementing any corrective and/or remedial measures ordered by state or federal authorities, or agreed to by virtue of a settlement or compromise;

(g)     costs incurred in implementing additional compliance and reporting procedures; and

(h)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Wynn.

**DERIVATIVE AND DEMAND ALLEGATIONS**

160.    Plaintiff brings this action derivatively in the right and for the benefit of Wynn to redress injuries suffered, and to be suffered, by Wynn as a direct result of violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Wynn is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

161.    Plaintiff will adequately and fairly represent the interests of Wynn in enforcing and prosecuting its rights.

162.    Plaintiff was a stockholder of Wynn at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Wynn stockholder.

163.    The Board had an affirmative duty under Nevada law to conduct a reasonable, objective, and good faith investigation into the allegations in the Demand, and to determine on the basis of that investigation whether the Demand's factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the Company's best interests.  Boards of directors that fulfill their duty to investigate a stockholder's litigation demand reasonably, objectively, and in good faith, and to act reasonably on the basis of the investigation, retain the protections of the business judgment rule's presumption that they acted independently, on a reasonably informed basis, and in good faith.  Boards of directors that fail to do so may not avail themselves of this presumption, and the stockholder's litigation demand will be deemed to have been wrongfully refused.

164.    On August 28, 2018, on behalf of plaintiff, plaintiff's counsel sent the Demand to the Board, demanding the Board investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging Wynn, including certain of the Company's current and former officers and directors.[7]  In response, counsel at Potter Anderson stated they had been retained as counsel by an undisclosed "committee of the Board" that was

---

[7] A true and correct copy of the Demand is attached hereto as Exhibit A.

1   purportedly investigating the Demand as well as several other stockholder demand letters Potter

2   Anderson stated were similar to plaintiff's.[8]

3         165.    On September 28, 2018, plaintiff's counsel sent Potter Anderson a follow-up letter

4   requesting the identities of the members of the committee of the Board that was investigating the

5   demands.[9]  Plaintiff's counsel also requested the demand letters that Wynn's counsel had stated were

6   similar to the Demand.

7         166.    After not hearing from the Company for two months, on November 27, 2018, plaintiff's

8   counsel sent a follow-up letter requesting an update on the status of the investigation and repeating his

9   previous request for Potter Anderson to provide the identities of the Board members that were

10   investigating the demands.[10]  Plaintiff's counsel also reiterated his request that counsel for Wynn provide

11   copies of the other demands that the committee was apparently also investigating.

12         167.    Potter Anderson responded on November 29, 2018, declining to identify the committee or

13   provide the requested documents.[11]  Instead, Potter Anderson's letter stated that the Board had received

14   four litigation demands concerning defendant S. Wynn's inappropriate conduct, and that, on the

15   recommendation of a "Demand Review Committee," would be deferring its final decision on all such

16   demands pending receipt of the results of certain undisclosed "ongoing administrative inquiries."  The

17   letter claimed that the Demand Review Committee was "actively monitoring those proceedings," and

18   stated that it would advise plaintiff's counsel of the Board's ultimate decision once it was made.

19         168.    Plaintiff's counsel responded the following day, on November 30, 2018, requesting Potter

20   Anderson identify the "administrative inquiries" for which the Board was deferring its final decision on

21   the Demand and when the Demand Review Committee or Board expected to receive the results of these

22

23

_____

24   [8] A true and correct copy of Potter Anderson's September 12, 2018 letter is attached hereto as Exhibit B.

25   [9] A true and correct copy of plaintiff's September 28, 2018 letter is attached hereto as Exhibit C.

26   [10] A true and correct copy of plaintiff's November 27, 2018 letter is attached hereto as Exhibit D.

27   [11] A true and correct copy of Potter Anderson's November 29, 2018 letter is attached hereto as Exhibit E.

28

1   inquiries.[12]   Plaintiff's counsel also reiterated his previous requests that Potter Anderson provide the

2   identities of the members of the Demand Review Committee.

3       169.    On January 7, 2019, the Board rejected the Demand.[13]   In a cursory two-page letter,

4   Potter Anderson notified plaintiff that the Board had made the decision to "suspend indefinitely" any

5   further proceedings on the part of the Demand Review Committee related to the Demand.   Potter

6   Anderson cited pending derivative litigation in the U.S. District Court of Nevada related to the

7   allegations in the Demand, and stated that after the trial court denied the Company's motion to dismiss

8   that action, the Board formed a Special Litigation Committee to investigate the allegations in the

9   derivative litigation.   Potter Anderson incorrectly asserted that the Demand was therefore moot.

10      170.    Contrary to Potter Anderson's assertion, the fact that the pending derivative action

11  survived the Company's motion to dismiss does not render plaintiff's Demand moot.   As the Nevada

12  Supreme Court reaffirmed in *In re Amerco Derivative Litigation*, 127 Nev. 196, 222 (2011), "[i]f the

13  district court should find the pleadings provide sufficient particularized facts to show demand futility, it

14  must later conduct an evidentiary hearing to determine, as a matter of law, whether the demand

15  requirement nevertheless deprives the shareholder of his or her standing to sue" (quotation omitted).

16  Neither does the mere presence of the related derivative action obviate the need for the Board to

17  consider the Demand.   Unlike a demand, a derivative action leaves the wrongdoers in charge of the

18  Company.   Accordingly, the Demand is not moot and the Board had a duty to consider plaintiff's

19  Demand and conduct a reasonable investigation into the allegations detailed therein.

20      171.    The Board's decision to refuse the Demand was not based on a reasonable investigation

21  by independent parties, and the refusal was contrary to Wynn's best interests.   Defendants breached their

22  fiduciary duties to the Company, wasted hundreds of millions of dollars, caused or permitted the

23  Company to engage in unlawful conduct, and damaged Wynn's reputation.   The claims in the Demand

24  are well-founded, valuable, and the Company's only hope of recovery.

25

26  [12] A true and correct copy of plaintiff's November 30, 2018 letter is attached hereto as Exhibit F.

27  [13] A true and correct copy of the Demand refusal is attached hereto as Exhibit G.

28

172.    Plaintiff has not made any demand on the other stockholders of Wynn to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Wynn is a publicly held company with over 108 million shares outstanding and thousands of stockholders as of October 31, 2018;

(b)     making demand on such a large number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFF'S CLAIMS OR, ALTERNATIVELY, WAS TOLLED

173.    The statute of limitations does not bar plaintiff's section 14(a) Exchange Act claims. Plaintiff has brought this complaint within the applicable statute of limitations.  The limitations period for a section 14(a) claim is "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation."  *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1212 (N.D. Cal. 2007) (quoting *Westinghouse Elec. Corp. by Levit v. Franklin*, 993 F.2d 349, 353 (3d Cir. 1993)).  While the 2016 Proxy was issued on March 4, 2016 and the 2017 Proxy was issued on March 10, 2017, the "facts constituting the violation" were not discovered at those times. Plaintiff did not uncover these facts until January 2019, when the Nevada Gaming Control Board filed a complaint with the Nevada Gaming Commission revealing that the "internal control breakdowns that occurred in relation to allegations of misconduct" were directly attributable to "the ability of former WYNN executives to operate outside of Company policies and procedures."  Plaintiff's section 14(a) Exchange Act claims as to the Proxies was timely.

174.    Alternatively, the statute of limitations was tolled until the Board rejected plaintiff's Demand.  In order to bring any stockholder derivative action it is necessary to obtain facts regarding the underlying wrong as well as facts from which a stockholder may claim that demand was wrongfully refused.  Accordingly, even assuming the statute of limitations began to run on January 26, 2018, when the *WSJ* published the article detailing allegations of sexual harassment and abuse by defendant S. Wynn, the statute was tolled as of August 28, 2018, when plaintiff sent his Demand.  The statute of

limitations was thereafter tolled until January 7, 2019, when the Board rejected the Demand.

175.    Furthermore, in his Demand, plaintiff explicitly expressed his concern to the Board regarding the statute of limitations and advised the Board to secure tolling agreements in order to preserve plaintiff's claims.  Plaintiff's Demand further noted that should the Company fail to obtain tolling agreements and allow the statute of limitation to expire, the Board would be required to investigate and pursue claims for breaches of fiduciary duties against those responsible for failing to preserve plaintiff's claims.  In particular, plaintiff's Demand stated:

> The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods.  Because of concern that the proceedings cannot be initiated prior to the expiration of the relevant statute of limitations, the Board should secure tolling agreements from all potential defendants, which will allow the Board to complete its investigation and pursue all appropriate legal remedies.  Moreover, to the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or obtaining tolling agreements, the Board must investigate and pursue claims for breaches of fiduciary duties and/or legal malpractice against those who allowed any statute of limitations periods to expire.

176.    Thus, even though plaintiff specifically alerted the Board it was obligated by its fiduciary duties to protect the Company's interests, the Board failed to act in accordance with these duties.  The Board's decision not to enter into tolling agreements with the wrongdoers is not consistent with a Board that acted independently and in good faith.  This decision only further establishes that the Board's refusal of plaintiff's Demand was not based on a reasonable investigation.

177.    The Board's failure to secure tolling agreements should not bar plaintiff, an innocent stockholder, from bringing this derivative suit.

## COUNT I

### Against the Director Defendants for Violation of Section 14(a) of the Exchange Act

178.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in

fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

180.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2016 Proxy and 2017 Proxy (collectively, the "Proxies").  In the Proxies, the Board solicited stockholder votes to reelect certain directors to the Board.  The Proxies, however, misrepresented and failed to disclose defendant S. Wynn's pattern of sexual misconduct and the Company's inadequate internal controls which facilitated the illegal behavior detailed herein.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Wynn misled and/or deceived its stockholders by making misleading statements that were essential links in stockholders heeding Wynn's recommendation to reelect certain Board members.

181.    The misleading information contained in the Proxies was material to Wynn stockholders in determining whether or not to elect these defendants.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the Proxies were essential links in the reelection of nominees to the Board.

182.    Plaintiff, on behalf of Wynn, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    The Individual Defendants owed and owe Wynn fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Wynn the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of Wynn's compliance with and the duty to conduct good faith

investigations into known violations of laws, regulations, and internal policies concerning sexual harassment and inappropriate behavior.

185.    The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Wynn, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

186.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants breached their fiduciary duties by knowingly, recklessly, or with gross negligence:  (i) failing to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowing a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) allowing excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (iv) making or allowing the Company to make improper statements in its press releases, public filings, and Proxies; and (v) violating the Company's Guidelines, Code of Conduct, and other duties required of executives as set forth in the Articles and other corporate governance documents.  Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

187.    The Director Defendants, as directors of the Company, owed Wynn the highest duty of loyalty.  These defendants breached their duty of loyalty by knowingly or recklessly:  (i) failing to ensure that Wynn had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations; (ii) allowing a toxic work environment, which included a rampant pattern and practice of sexual harassment to go unchecked for over a decade; (iii) failing to adequately investigate defendant S. Wynn's misconduct, despite knowledge thereof; (iv) allowing excessive compensation to be awarded to defendant S. Wynn notwithstanding the damage he has caused to the Company's image and goodwill; (v) allowing defendant S. Wynn to retain

his Wynn stock despite the Board's ability to redeem his stock at a significant discount, given the damages suffered by the Company due to his pattern of sexual harassment and assault of female Wynn employees; (vi) making or allowing the Company to make improper statements in its press releases, public filings, and Proxies; (vii) violating the Company's Guidelines, Code of Conduct, and other duties required of Board members as set forth in the Articles and other corporate governance documents; and (viii) improperly rejecting the Demand.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

188.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight in their duty to appropriately review Wynn's public disclosures, as required by the Audit Committee Charter in effect at the time.

189.    The Compliance Committee Defendants had a duty to ensure the Company maintained the highest level of regulatory compliance.  The Compliance Committee Defendants breached their duties of loyalty and good faith by failing to ensure that the Company was operated in compliance with the law.

190.    The Compensation Committee Defendants reviewed and approved defendant S. Wynn's compensation.  The Compensation Committee Defendants breached their duties of loyalty and good faith by approving defendant S. Wynn's excessive compensation, despite his rampant pattern and practice of sexual harassment.

191.    The Insider Selling Defendants breached their duty of loyalty by selling Wynn stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was proprietary, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Wynn common stock.

192.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wynn has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

193.    Plaintiff, on behalf of Wynn, has no adequate remedy at law.

<u>**COUNT III**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

194.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

195.    As detailed above, the Individual Defendants diverted corporate assets for improper and unnecessary purposes to protect their positions as officers and directors (and the financial and other benefits flowing therefrom).

196.    The Individual Defendants knowingly unheeded their corporate stewardship responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Wynn by failing to address the known pervasive sexual harassment practices at the Company, and by approving excessive compensation to defendant S. Wynn at the time when he was directly and actively contributing to the creation and perpetuation of the hostile work environment at Wynn.   All compensation to defendant S. Wynn was a waste of Wynn's corporate assets.

197.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations as set forth herein, they have caused the Company to waste valuable corporate assets and expend corporate funds unnecessarily by providing defendant S. Wynn with excessive and unjustified compensation during the time period when sexual harassment at Wynn flourished due to his efforts.

198.    The Board also wasted millions of dollars by failing to seek to redeem defendant S. Wynn's shares at a significant discount and revoke his stock options, as provided for by the Company's Articles.  Defendant Maddox further wasted corporate assets by accelerating the announcement of a Board approved increase in the annual dividend of 50%, or $1 more per share, effectively giving defendant S. Wynn a multimillion-dollar bonus only days after executing his severance agreement.

199.    Finally, as a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Wynn is subject to the Securities Class Action.   The Individual Defendants have caused Wynn to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

200.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

201.    Plaintiff, on behalf of Wynn, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

202.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

203.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Wynn.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Wynn.

204.    As alleged in detail herein, defendant S. Wynn has engaged in widespread misconduct, and yet received total compensation of over $128 million between the years 2013 and 2017, inclusive. Accordingly, defendant S. Wynn received improper remuneration despite his widespread misconduct. Defendant S. Wynn was thereby unjustly enriched by his own wrongful acts.

205.    The Insider Selling Defendants sold Wynn stock while in possession of material, nonpublic Company information that artificially inflated the price of Wynn stock.   As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material, nonpublic Company inside information.

206.    Plaintiff, as a stockholder and representative of Wynn, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

207.    Plaintiff, on behalf of Wynn, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Wynn, demands judgment as follows:

A.    Against all of the defendants and in favor of Wynn for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.    Directing Wynn to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wynn and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Wynn's Bylaws or Articles and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen the Company's internal controls and Board oversight concerning inappropriate conduct;

2.    a proposal to strengthen Wynn's internal controls over financial reporting and oversight of its disclosure procedures;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.    a provision to control insider selling; and

5.    a provision to permit the stockholders of Wynn to nominate at least three candidates for election to the Board;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Wynn has an effective remedy;

D.    Awarding to Wynn restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: March 25, 2019

/s/John P. Aldrich
JOHN P. ALDRICH
ALDRICH LAW FIRM, LTD.
7866 West Sahara Avenue
Las Vegas, NV 89117
Telephone: (702) 853-5490
Facsimile: (702) 227-1975
E-mail: jaldrich@johnaldrichlawfirm.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
ASHLEY R. RIFKIN
STEVEN R. WEDEKING
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
          csmith@robbinsarroyo.com
          arifkin@robbinsarroyo.com
          swedeking@robbinsarroyo.com

Attorneys for Plaintiff

1327110